GEORGE F. CURRIE v. ATLANTIC CITY AND THE ATLANTIC CITY STREET RAILWAY COMPANY.

Argued November 7, 1900—Decided February 25, 1901.

1. The "consents in writing of the owners of at least one-half in amount of property" fronting upon a street railway route required by "An act to regulate the construction and maintenance of street railroads in this state," approved May 16th, 1894 (*Pamph. L., p.* 374), and by "An act to regulate the construction, operation and maintenance of street railroads in this state," approved April 21st, 1896 (*Pamph. L., p.* 329), are not licenses or concessions granting to the railway company some interest in land or right in the streets; they are in effect votes for the adoption of a legislative scheme by which a special jurisdiction over highways is conferred upon the governing body of the municipality.

2. There can be no effective withdrawal of any consent after jurisdiction has vested in the municipal body.

3. Jurisdiction that has vested in the manner prescribed by the legislature will not be ousted by the subsequent conveyance by an owner of the property by virtue of the ownership of which he had consented to such jurisdiction.

4. Jurisdiction that is acquired over a special subject is not exhausted by lapse of time or by ineffectual exercises of it.

5. "Location of a route" in a statute implies the right to construct and operate a railway upon such route if that was its meaning at the time it was used in the legislative act.

6. A board of education, nothing more appearing, cannot give a valid "consent" with respect to a school-house lot for the statutory purpose in question.

7. When the beginning point of a proposed street railway route is to the north of a natural boundary that bisects an owner's property, such owner can give a valid consent with respect to so much only of his property as lies to the north of such boundary.

8. A consent based upon the ownership of property fronting upon a street over which permission is desired is limited to such street, and has no application to any street upon which the property does not front.

9. *Quære.* As to the effect upon an otherwise valid consent of an unauthorized restriction upon the exercise of the jurisdiction conferred.

On *certiorari.*

Before Justices GARRISON and GARRETSON.

For the prosecutor, *Robert E. Stephany.*

For the defendants, *Clarence L. Cole* and *Mark R. Sooy.*

The opinion of the court was delivered by

GARRISON, J.   The prosecutor, who is the owner of property fronting upon South Carolina and Arctic avenues, in Atlantic City, has removed into this court an ordinance of that city that authorizes the location of tracks and the construction, maintenance and operation of a street railway over the two avenues above mentioned and over Rhode Island avenue.   This ordinance is attacked by the prosecutor upon the ground that the city council had not jurisdiction to pass it, for the reason that there was not on file in the office of the city clerk the consents, in writing, of the owners of at least one-half in amount of the property fronting on the parts of said avenues to which the said ordinance applied.

The right of the prosecutor to attack this ordinance by *certiorari* may be rested upon the decision of this court in *Oliver* v. *Jersey City,* 34 *Vroom* 96; affirmed by the Court of Errors, *Id.* 634.

All of the reasons filed touch, in some form, the efficiency of the "consents" upon which the statutory permission of city council must rest.   A general idea of the situation at the time this ordinance was passed is essential to an understanding of the facts to be dealt with, and some general remarks upon the legal principles involved will show what is to be decided.

On January 28th, 1895, the defendant street railway company made its first application for permission to construct, maintain and operate its railway over the route that is granted by the present ordinance.   The identical "consents in writing" that are now the subject of controversy were then on file with the clerk of Atlantic City, and were the basis of the jurisdiction invoked at that time.   The application then made was, by resolution, refused.   Certain of the signers of these consents subsequently gave notice, in writing, to city council that they revoked their consent; and certain other

signers, at various dates, conveyed the property by virtue of which they had signed their consents. Upon August 22d, 1898, the railway company again applied for the same permission, and city council passed an ordinance granting the permission it was authorized to grant, but annexing certain conditions that were not within the statute, and were not accepted by the company. In this state the matter rested until October 2d, 1899, when the ordinance now under review was introduced; subsequently it was passed and accepted by the company. Jurisdiction to grant the permission embodied in this ordinance rests upon the consents originally filed in 1895, and still on file in the office of the municipal clerk.

Upon this state of facts various questions arise, and at the outset some principle must be adopted as to the nature and legal effect of the so-called "consents" of the owners of property fronting upon the street railway route. The language of the legislative provision, in so far as it is pertinent, is as follows: "Provided, however, that such petition for the designation of route, construction, maintenance and operation of a street railway company shall not be granted by the governing body of any municipality, town, township, village or borough in this state until there be filed with the clerk of such municipality, town, township, village or borough, or other equivalent officer, the consent, in writing, of the owner or owners of at least one-half in amount in lineal feet of property fronting on such street, highway, avenue or other public place, or upon the part of such street, highway, avenue or other public place through which permission to construct, operate and maintain a street railway is asked, and any such consent may be signed by an attorney in fact thereunto duly authorized and by the executor or trustee of any deceased owner or owners." *Pamph. L.* 1894, *p.* 375.

The language of the act of 1896 (*Pamph. L., p.* 330), though abbreviated, is to the same effect.

The former of these acts was the one in force when the defendant's application was first made.

A careful reading of this language dissipates a notion that

is responsible for much argument that is wide of the mark
and for some judicial decisions in other states, namely, that
before a street railway company may lawfully construct its
line upon a highway it must have two concessions—one from
the owners of property along its route and the other from
city council—called, respectively, in the statute *"consent"* and
*"permission."* This, however, is not the statutory require-
ment, nor is it in harmony with the legislative scheme. One
grant alone is required—the permission of the governing body
of the municipality. It is that body, and not the railway
company, that must have the consent of a majority of the
abutting owners to warrant its action. In brief, the so-called
"consents" are neither licenses nor concessions granting to
the railway company some interest in land or right in the
highway; on the contrary, they are the statutory mode of
conferring upon the legislative body of the municipality
jurisdiction over a special subject. No appreciable weight,
therefore, attaches to arguments or decisions that treat these
consents as licenses to the railway company, or as easements,
or, as in one frequently cited case, "incorporeal heredita-
ments." *Detroit Street Railway Co.* v. *Detroit,* 26 *L. R. A.*
667, 678.

That the consent of a majority in amount of abutting
property owners was intended to confer a jurisdiction upon
city council, and not to grant an interest in real estate to
the railway company, seems clear from the consideration
that such railway use imposes no additional servitude upon
the property owner's fee in the highway. There being, there-
fore, nothing for an easement to operate upon, it is not per-
missible to assume that the legislature intended to require
a purely nugatory concession from the landowners. Upon
the other hand, the hypothesis that some real interest in the
highway is acquired by the railway through these consents,
involves two inadmissible assumptions—*first,* that the legis-
lature thought that it was imposing an additional servitude
upon the land in the street, and *second,* that it was intended
to impose such servitude without requiring compensation as
to those owners who did not consent to its imposition.

Both horns of this dilemma are avoided, without departing from the plain words of the statute, by regarding the right of the municipal body to assume this special jurisdiction as depending upon the adoption of a legislative scheme by the special class of voters named therein. There are many familiar instances of the submission of such schemes by the legislature to the inhabitants of cities, or of school or taxing districts. In the present instance the voters are the owners of property fronting on the streets affected, the written consents of these owners are their ballots, and the ratio between the sum total of consents and the lineal frontage of abutting property voted upon determines whether the legislative scheme conferring the special jurisdiction has been adopted. This construction gives effect to all of the language of these statutes, while, at the same time, it avoids the palpable absurdities that result from the only other interpretation suggested. It affords, furthermore, a rational basis for dealing in a practicable manner with the questions of revocation and conveyance of property after the jurisdiction has attached and of its exhaustion by lapse of time or ineffectual exercise.

The logical result of these views is that there can be no effective withdrawal of a consent after the jurisdiction has vested in the municipal council, which is when the consents filed with the city clerk represent a majority of all the property affected; the same is true in respect to the conveyance of property after enough consents have been filed. It is almost essential to the practical administration of this law that this should be so, otherwise the jurisdiction of the city might be nullified by a single individual at the very instant that final action was being taken, which surely was not what was in the legislative mind at the time of the adoption of this scheme. This result is not out of harmony with the decision of *Biddle* v. *Riverton*, 29 *Vroom* 289, which was cited in opposition to it. In that case a borough, upon December 31st, 1894, passed an ordinance directing that an election be held under section 515 of the Borough act. *Gen. Stat.*, *p.* 275. That statute prescribed as a jurisdictional prerequisite that such action must have been petitioned for and

consented to by the owners of more than one-half in value of the taxable property in the borough. Such a petition was signed by the requisite number of taxpayers before December 26th, 1894, and upon that day (the petition not yet having been filed or brought to the official knowledge of the borough council) four of the signers, by communication in writing, withdrew their names, so that "on December 31st, 1894," I quote the language of Mr. Justice Magie, "council having before it this paper, and also the communications of four of its signers withdrawing their consent and request indicated by their signature, passed the ordinance in question. In my judgment it exceeded its powers in so doing, for it did not have before it the petition and consent of the required number of owners of taxable property. The consent appearing from the petition was negatived by the other communications." I concur fully in this decision, which in nowise touches the question of the efficient withdrawal of a consent after statutory effect has been given to it.

The question of the exhaustion of jurisdiction by ineffectual exercise of it, or by mere lapse of time, is fully met upon general principles by the distinction that exists in this respect between the mere execution of a power and the acquisition of a jurisdiction. The matter, moreover, is covered by a comprehensive provision occurring in each of the statutes cited and bearing in the most unmistakable manner upon the legislative will in this particular. I quote from the act of 1896 : "Provided, however, that if any consents have heretofore been obtained to the construction, operation and maintenance of any such railway in, along or upon any street or streets, road or roads, highway or highways, public place or places in this state, and *such consents have been filed as herein directed,* such consents, under any application made under this act, shall have the same force and effect and be considered and counted the same as consents given and filed after the passage of this act." *Pamph. L., p.* 330.

The conclusion I have reached is that the consents filed in 1895 conferred upon the city council jurisdiction to pass the ordinance in question, provided such consents were in

other respects competent. This reservation introduces the next criticism made by the prosecutor upon the efficiency of these consents, which is that they were for the "location of the tracks of the railway company, whereas the ordinance grants permission to locate tracks and to construct, operate and maintain a street railway upon such location."

The argument is that there is a substantial difference between the location of tracks and the permission to construct, operate and maintain required by the Street Railway act of 1894, and a decision is cited to the effect that a petition for the location of tracks under the act of 1893, and antedating the act of 1894, would not authorize city council in giving the permission provided for in the last-mentioned act. *Camden Horse Railroad Co.* v. *Traction Company*, 29 *Vroom* 102.

The distinction thus pointed out and the manner in which it arose suggest the reply to the argument that is based upon it: Prior to the time when this distinction became material, the location of the tracks of a street railway carried with it, by common acceptation, the right to operate its line upon such location, which is all that the words "construct, maintain and operate" are capable of meaning. The defendant company was incorporated, not under either of the Traction acts, but under the Street Railway act of 1886. *Pamph. L.,* *p.* 185. This legislative source of the defendant's powers unquestionably used the expression "location of route" to mean all that is now intended by the words "location, construction and operation;" it also required the same consents of property owners as the later acts. The advent of traction roads, with their more dangerous methods and their use of poles and wires in the streets, gave to their actual location a significance that it did not previously have. In consequence, the location of such a road came to be treated as a separate subject of legislative oversight. This practical difference led to the distinction now insisted upon, and to the arguments based upon it. Inasmuch, however, as the consents that are now the subject of criticism were, in effect, votes in favor of the exercise by Atlantic City of a jurisdiction to grant certain privileges to the Atlantic City Street

Railway Company, under its charter, such votes and their effect upon the legislative scheme submitted to the property owners will be determined by the meaning of the legislative language at the time of its adoption, and not by raising distinctions, not then known, whose effect would be to frustrate the will of the voter and of the lawmaker alike.

I conclude that the city council, at the time it passed the defendant's ordinance, had the power so to do, and that, by this ordinance, the company obtained the city's permission to locate its tracks and to construct, operate and maintain its railway upon the highways of Atlantic City mentioned in the ordinance.

This disposes of the first six of the reasons filed by the prosecutor, all of which, in some form, turn upon the notion that the consents of the property owners are in the nature of licenses or easements.

The remaining reasons attack the validity of particular consents, and will be considered in the order of the prosecutor's brief, stating the substance only of each.

Reason No. 7. That the board of education of Atlantic City had no authority to give consent for the school property. This point is well taken. The board of education had not the title to the land upon which the school buildings stand; it is in no sense their owner and is not an attorney in fact for this purpose.

Reason No. 8. That Somers Casino Company, which owns one hundred and ninety and fifty-four hundredths feet fronting on that part of South Carolina avenue through which the permission of council is asked, gave its consent for two hundred and ninety feet on that avenue.

The significance of this reason is that the property of this owner is bisected by the "boardwalk," along the ocean, so that ninety-four and forty-six hundredths feet lie to the seaward or south side of that highway and one hundred and ninety-five and fifty-four hundredths feet to the north side of it. The beginning point of the location asked for and granted by the ordinance is to the north of the boardwalk. The statute is that the consent shall be with respect to prop-

erty fronting on the streets    *   *   *    or upon parts of the street, &c., upon which permission is asked.  It seems clear that the contention of the prosecutor, that only the one hundred and ninety-five and fifty-four hundredths feet can be counted, is the correct one.

The same may be said with respect to the ninth reason, which concerns the property of Martina M. Richards, whose consent should be for two hundred and sixty-nine and sixty-six hundredths feet instead of for three hundred and sixty feet.

Reason 10. That the consent of Joseph Sharp is for the "location of one track."

The purpose apparent upon the face of this consent was to limit the exercise of the jurisdiction it conferred.  There being nothing in the statute to authorize any such qualification by the property owner of his consent, it is contended, on behalf of the jurisdiction of city council, that the restriction was nugatory and had the legal effect of subtracting nothing from what preceded it.

The question has, however, an importance disproportionate to its bearing upon the present case, to the decision of which it is not necessary.  It is therefore passed without being decided.

The meaning of the eleventh and last reason is not entirely clear.  If it be that consents based upon the ownership of property fronting upon a given street over which permission is desired are limited to such street, and have no application to streets upon which such property does not front, the contention is correct.  This is the plain import of the statute.  If the contention be that the statute further limits the operation of this rule to parts of a street, the question is of more difficulty, and is not raised by the reason.

The result of the consideration that has been given to this case is to affirm the ordinance of the city council of Atlantic City that has been certified in response to this writ.