164 N.J. Super. 246 (1978)
395 A.2d 1280
FIDELITY UNION TRUST COMPANY, A BANKING CORPORATION OF THE STATE OF NEW JERSEY, AS TRUSTEE UNDER THE GENERAL BOND RESOLUTION OF THE NEW JERSEY HIGHWAY AUTHORITY ADOPTED JULY 8, 1953, AS SUPPLEMENTED: FIRST NATIONAL STATE BANK OF NEW JERSEY, A NATIONAL BANKING ASSOCIATION, AS TRUSTEE UNDER THE JUNIOR BOND RESOLUTION OF THE NEW JERSEY HIGHWAY AUTHORITY ADOPTED JULY 7, 1962, AS SUPPLEMENTED: MIDLANTIC NATIONAL BANK, A NATIONAL BANKING ASSOCIATION, AS TRUSTEE UNDER THE IMPROVEMENT BOND RESOLUTION OF THE NEW JERSEY HIGHWAY AUTHORITY ADOPTED JULY 27, 1971, AS SUPPLEMENTED, PLAINTIFFS,
v.
NEW JERSEY HIGHWAY AUTHORITY, A BODY CORPORATE AND POLITIC CREATED AND EXISTING UNDER AND BY VIRTUE OF CHAPTER 16 OF THE LAWS OF 1952, AS AMENDED AND SUPPLEMENTED, AND JOHN J. DEGNAN, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided November 16, 1978.
*249 Mr. Kevin J. Coakley for plaintiff First National State Bank (Messrs. McElroy, Connell, Foley & Geiser, attorneys).
Mr. Robert Fischer for plaintiff Fidelity Union Trust Company (Messrs. Riker, Danzig, Scherer & Debevoise, attorneys).
Mr. Robert P. Hazlehurst, Jr., for plaintiff Midlantic National Bank (Messrs. Pitney, Hardin & Kipp, attorneys).
Mr. Arthur D. Grossman for defendant New Jersey Highway Authority (Messrs. Fox and Fox, attorneys; Mr. Fred L. Schwanwede on the brief).
Mr. John J. Degnan, Attorney General of New Jersey (Mr. Leonard A. Peduto, Jr. on the brief).
DWYER, J.S.C.
By cross-motions for summary judgment the parties to this declaratory judgment action seek to have determined whether L. 1973, c. 370 (N.J.S.A. 27:12B-4), prohibiting the issuance of bonds or adjusting of tolls without the prior written consent of the Governor and one other designated official and providing that the Governor shall have veto power over the minutes of the meetings of the New Jersey Highway Authority, is unconstitutional in respect to the holders of bonds issued before the effective date of such *250 statute. It is contended that this statute violates Art. I, § 10 of the Constitution of the United States of America prohibiting any state from passing any law which impairs the obligations of a contract, and Art. IV, § 7, par. 3, of the Constitution of New Jersey prohibiting the Legislature from passing any law impairing the obligation of any contract. It is further argued that the statute violates the provisions of the Constitutions of the United States of America and New Jersey, respectively prohibiting the taking of property without due process of law in that said law is arbitrary, capricious, unreasonable, invidiously discriminatory and oppressive if applied to the holders of the aforesaid bonds. Plaintiff's urge the affirmative. Defendants urge the negative.
Pending the decision in United States Trust Co. v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), this action was stayed at the request of all parties. Subsequent thereto they updated certain data, then made the motions for summary judgment with a stipulation that any damage claims would be submitted after the resolution of the questions now before the court.
Plaintiffs are three banks appointed trustees (trustees) under resolutions authorizing the issuance of bonds for the construction or improvement of the Garden State Parkway by the New Jersey Highway Authority (Authority). Defendants are the Authority and the Attorney General of the State of New Jersey (Attorney General). Listed below are the dates the resolutions appointing trustees and setting forth the conditions for issuance of, and security for, the bonds were adopted, and the amount of bonds outstanding as of December 31, 1977:
1. July 8, 1953 resolution appointed Fidelity Union Trust Co. as trustee.

 Issue Amount
 Series Date 12/31/77
 A[*] 7/1/53 $68,970,000
 B[*] 1/1/54 62,888,000
 C 11/1/54 9,118,000

*251
 D[**] 7/1/56 -
 E[**] 7/1/56 -
 F 1/1/64 11,984,000

(As to asterisks see footnote 1.)[1]
2. July 7, 1962 resolution appointed Midlantic National Bank as trustee. Junior Bond Resolution.

 Issue Amount
 Series Date 12/31/77
 One 7/1/62 $40,000,000

3. July 27, 1971 resolution appointed First National State Bank as trustee. Improvement Bonds.

 Series Issue Date Amount 12/31/77
 1971 7/1/71 $80,000,000

Authority was established as a body corporate and politic by L. 1952, c. 16. See N.J.S.A. 27:12B-1 et seq. Said law empowered Authority to issue negotiable bonds and notes and to provide covenants for security to the purchasers of bonds. The sections relevant to provisions for security are found in N.J.S.A. 27:12B-5, 8, 9, 11, 14 and 18. In summary form they provide:
(a) N.J.S.A. 27:12B-5(i) of the act provides that the Authority shall have the power "To fix and revise from time to time and charge and collect tolls or other charges for transit over or use of any project acquired or constructed by it."
(b) N.J.S.A. 27:12B-5(j) of the act provides that the Authority shall have the power "To establish and enforce rules and regulations for the use of any project."
(c) N.J.S.A. 27:12B-8(b) of the act provides that "[e]xcept as may be otherwise expressly provided by the Authority, every issue of bonds or notes shall be general obligations payable out of any moneys or revenues of the Authority, subject only to any agreements with the holders of particular bonds or notes pledging any particular moneys or revenues."
*252 (d) N.J.S.A. 27:12B-9 of the act sets forth provisions which the Authority may include in any resolution authorizing bonds or notes. It provides that the resolution authorizing the issuance of bonds or notes "shall constitute a contract with the holders thereof." (parentheses deleted). The provisions which may be included in any such resolution are:
(1) "to pledge all or any part of the Authority's tolls or revenues" (§ 9(a)(i));
(2) "to covenant as to the rates of toll and other charges to be established and charged, the amount to be raised each year or other period of time by tolls or other revenues, and as to the use and disposition to be made thereof" (§ 9(a)(viii)), and
(3) "[to covenant] to do or refrain from doing such acts and things as may be necessary or convenient or desirable in order to better secure the bonds or notes or which, in the absolute discretion of the Authority, will tend to make the bonds or notes more marketable" (§ 9(a)(xiv)).
(e) N.J.S.A. 27:12B-9(c) further provides that bonds or notes of the Authority may be issued "without obtaining the consent of any department, division, commission, board, bureau or agency of the State, and without any other proceeding or the happening of any other conditions or things than those proceedings, conditions or things which are specifically required by this act."
(f) N.J.S.A. 27:12B-14 of the act provides:
"The Authority is hereby authorized to fix, revise, charge and collect tolls and charges for the use of each project and the different parts or sections thereof, * * *. Such tolls and charges shall be so fixed and adjusted as to effectuate the purposes of this act and in any event to carry out and perform the terms and provisions of any contract with or for the benefit of holders of bonds or notes. Such tolls and charges shall not be subject to supervision or regulation by any other commission, board, bureau or agency of the State. The use and disposition of tolls, charges and revenues shall be subject to the provisions of any resolution authorizing the issuance of such bonds or notes." (Emphasis supplied).
(g) N.J.S.A. 27:12B-18(a) of the act specifies that "[no] vehicle shall be permitted to make use of any project except upon the payment of such tolls as may from time to time be prescribed by the Authority.
In N.J.S.A. 27:12B-11 the State in 1952 gave its solemn pledge to bondholders that it would not infringe, in the future, on the powers vested in the Authority:
The State of New Jersey does pledge to and agree with the holders of the bonds or notes issued pursuant to authority contained in this *253 act, that the State will not limit or restrict the rights hereby vested in the Authority to maintain, acquire, construct, reconstruct and operate any project as defined in this act or to establish and collect such tolls or other charges as may be convenient or necessary to produce sufficient revenues to meet the expenses of maintenance and operation thereof and to fulfill the terms of any agreements made with the holders of such bonds or notes authorized by this Act or in any way impair the rights or remedies of the holders of such bonds or notes until the bonds or notes, together with interest thereon, are fully paid and discharged.
Pursuant to N.J.S.A. 27:12B-9(c), in connection with each bond resolution, Authority has included provisions for distributing revenues received into various funds to provide for the operation and maintenance of the Parkway, adjusting tolls to assure adequate revenues to meet expenses of operation and maintenance of the Parkway as well as costs of current and projected debt service.
In summary, the mechanics of the receipt and disbursements of Authority revenues with respect to the bonds is as follows:
1. The first fund established by the bond resolution is the revenue fund in which all revenues are placed. Operating expenses are paid from this fund. The remainder is poured over into other funds.
2. The first fund into which the revenue fund pours over is the bond service fund which is used to meet the Authority's annual bond service requirements.
3. The next fund supplied is the bond reserve fund. This fund must contain a reserve sufficient to pay 18 months of bond service.
4. Revenues are then poured over into the general fund which may be used for future needs of bond service and bond reserve funds and to finance construction projects.
5. Finally, there is the bond redemption fund. This fund (20% of general fund after payments to the bond service and reserve funds) is used to retire some outstanding bonds.
Throughout its entire history the Authority has consistently met all its obligations under the bond resolution.
*254 Section 711 of each of the bond resolutions set forth the conditions under which the tolls must be adjusted. Authority refers to § 711 as the 1.2 provision because it alleges that § 711 requires toll revenue less expenses and working capital to exceed 120% of debt service. In the event Authority fails to adjust tolls when the conditions for raising them arise, the language of the remedy the respective trustees may pursue differs.
Section 711 of Parkway revenue bond resolution adopted July 27, 1971 provides:
711. Tolls and Charges. 1. The Authority shall at all times fix, charge and collect such tolls and other charges for transit over or use of the Parkway System as shall be required in order that in each year Net Revenues, shall at least equal 1.20 times the sum of the Aggregate Debt Service and the Prior Lien Bond Service for such calendar year computed as of the beginning of such calendar year, and as shall be required in any event to pay or discharge all charges and liens whatsoever payable out of Revenues.
2. On or before October 1 in each year the Authority shall complete a review of its financial condition for the purpose of estimating whether Net Revenues will be sufficient to meet the requirement therefor specified in subsection 1 of this Section and shall by resolution make a determination with respect thereto. A copy of such resolution, certified by an Authorized Officer of the Authority, together with a certificate of such Authorized Officer setting forth a reasonably detailed statement of the actual and estimated Revenues, Operating Expenses, Prior Lien Bond Service, if any, Aggregate Debt Service, and other pertinent information for such year upon which such determination was made, shall be filed with the Trustee on or before October 20. If the Authority determines that Net Revenues may not be sufficient to meet the requirement therefor specified in subsection 1 of this Section, it shall forthwith cause the Traffic Consultants to make a study for the purpose of recommending a schedule of tolls for the Parkway System which in the opinion of the Traffic Consultants, will cause sufficient Revenues to be collected in the following calendar year to provide the Net Revenues to meet the requirement therefor specified in subsection 1 of this Section for such following year and will cause Revenues to be collected in such following and later calendar years sufficient to restore the amount of such deficiency in Net Revenues at the earliest practicable time. If, in any calendar year, the Revenues collected shall not have been sufficient to provide the Net Revenues to meet the requirement specified in said subsection 1, the Authority shall (a) *255 unless it has already obtained a traffic study and recommendation in compliance with the immediately preceding sentence, forthwith cause the Traffic Consultants to make a study for the purpose stated in such sentence, and (b) as promptly as practicable and in any case no later than the next April 1, establish and place in effect a schedule of tolls as recommended by the Traffic Consultants. In connection with any traffic study by the Traffic Consultants pursuant to this subsection there shall be prepared, filed with the Trustee and furnished to the Traffic Consultants a certificate of an Authorized Officer of the Authority setting forth the amount of Revenues required to provide the amount of Net Revenues necessary in order to meet the requirement therefor specified in subsection 1 of this Section (including any deficiency from the prior year). Such certificate shall include, for the year with respect to which such study is to be made, estimates of (i) the amount of Operating Expenses (including provision for working capital and reserves therefor) based on a certificate to this effect by the Consulting Engineers which shall accompany such statement, (ii) 1.20 times the sum of the Aggregate Debt Service and the Prior Lien Bond Service with respect to such year, and (iii) such other pertinent information for such year as shall be deemed necessary to make such traffic study.
3. The Authority shall not reduce any rate of toll for transit over or use of the Parkway System, unless, after giving effect to such toll reduction, estimated Net Revenues for the current and each future calendar year shall be not less than 1.30 times the sum of Maximum Annual Debt Service with respect to all Series of Bonds and the Maximum Annual Prior Lien Bond Service. Such determination shall be based on certificates conforming, to the extent applicable, to the requirements of paragraphs (3), (4) and (6) of subsection 2 of Section 204 which shall be filed with the Trustee.
4. The Authority shall forthwith upon the adoption of any schedule of tolls or revision thereof file certified copies thereof with the Trustee.
5. The failure in any calendar year to comply with the covenant in subsection 1 of this Section shall not constitute an Event of Default under the Resolution, if the Authority shall comply with subsection 2 of this Section; provided that if the Traffic Consultants (relying upon the certificate of the Authorized Officer of the Authority required by subsection 2 of this Section) shall be of the opinion, as shown by their certificate filed with the Trustee, that a schedule of tolls for the Parkway System which would provide Net Revenues to meet the requirements specified in subsection 1 of this Section is impracticable at that time, and the Authority therefore cannot comply with subsection 2 of this Section, then the Authority shall fix and establish such schedule of tolls as is recommended by the Traffic Consultants to comply as nearly as practicable with the covenant in subsection 1 of this Section, as evidenced in a certificate *256 filed with the Trustee, and in such event the failure of the Authority to comply with subsection 1 and subsection 2 of this Section shall not constitute an Event of Default under the provisions of the Resolution. The Trustee may and, upon the request of the Holders of not less than 10% in principal amount of the Bonds Outstanding and upon being indemnified to its satisfaction, shall institute and prosecute in a court of competent jurisdiction an appropriate action to compel the Authority to revise the schedule of tolls and fix, charge and collect tolls in accordance with the Act and with any one or more of the covenants contained in this Section.
The court selected the latest resolution because it necessarily had to provide for debt service on the earlier bonds and expressly treated the problem of what the trustee might do if the Authority failed to act under § 711 within the text of § 711. In the 1953 and 1962 resolutions the trustee's remedy upon the failure of the Authority to adjust tolls under the comparable § 711 provisions is dealt with under Article X, "Remedies."
Under § 1002 of the 1953 and 1962 resolutions, as well as of the 1971 resolution, the respective trustees, upon stated conditions and upon an event of default, have authority:
* * * to protect and enforce its rights and any rights * * * [of the trustee] and, to the full extent that the holders of such * * * [bonds] * * * themselves might do, the rights of such holders of * * * [bonds] * * * under the laws of the State of New Jersey or under the * * * [appropriate resolution] * * *, by such suits, actions or proceedings in equity or at law, either for the specific performance of any covenant or contract contained herein or in aid or execution of any power herein granted or for any proper legal or equitable remedy as the * * * [trustee] * * * shall deem most effectual to protect and enforce the rights aforesaid.
Each of the bonds issued under the 1953 resolution is guaranteed by the State of New Jersey and bears a guarantee in the form set forth in § 321 of that resolution which states:
Each Guaranteed Bond may bear thereon an expression of the guaranty by the State of the punctual payment of the principal of *257 and interest on such Guaranteed Bond, substantially in the following form duly executed by the signature of the State Treasurer of the State or of a person in the Department of the Treasury of the State appointed by him for that purpose:

Guaranty of the State of New Jersey
The punctual payment of the principal of and interest on the above bond of the New Jersey Highway Authority has been and is unconditionally guaranteed by the State of New Jersey, and the State is unconditionally liable for the payment, when due, of the principal and interest on said bond. * * * [Signature legend omitted]
As relevant to the issues in this matter, L. 1973, c. 370 amended N.J.S.A. 27:12B-4, effective January 7, 1974, by adding the following paragraphs thereto:
No resolution or other action of the authority providing for the issuance of bonds, refunding of bonds or other obligations or for the fixing, revising, or adjusting of tolls for the use of any highway projects or parts or sections thereof shall be adopted or otherwise made effective by the authority without the prior approval in writing of the Governor and at least one of the following: the State Treasurer and the Comptroller of the Treasury. The powers conferred in this section upon the Governor, the State Treasurer and the Comptroller of the Treasury shall be exercised with due regard for the rights of the holders of bonds of the authority at any time outstanding, and nothing in, or done pursuant to, this section shall in any way limit, restrict or alter the obligations or powers of the authority or any representative or officer of the authority to carry out and perform in every detail each and every covenant, agreement or contract at any time made or entered into by or on behalf of the authority with respect to its bonds or for the benefit, protection or security of the holders thereof.
A true copy of the minutes of every meeting of the authority shall be forthwith delivered by and under the certification of the secretary thereof, to the Governor. No action taken at such meeting by the authority shall have force or effect until 10 days (Saturdays, Sundays and holidays excepted) after such copy of the minutes shall have been delivered or the approval thereof [given] by the Governor prior thereto. If, in said 10-day period, the Governor returns such copy of the minutes with veto of any action * * * taken by the authority or any member thereof at such meeting, such action shall be null and of no effect.
*258 The sponsor's statement to the bill in the Assembly, and the Senate Committee's statement to the bill in the Senate, are set forth below.[2]
*259 There is no dispute that the statutes, the resolutions adopted by the Authority thereunder, and the outstanding bonds issued pursuant thereto are contracts. U.S. Trust Co. v. New Jersey, supra; N.J. Sports & Exposition Auth. v. McCrane, 61 N.J. 1, 28 (1972); N.J. Highway Auth. v. Sills, 109 N.J. Super. 424 (Ch. Div. 1970), supplemented 111 N.J. Super. 313 (Ch. Div. 1970), aff'd o.b. 58 N.J. 432 (1971).
Plaintiffs essentially urge that L. 1973, c. 370, gives to the Governor and another officer in the Executive Department of the State the power to veto the acts of Authority without any standard and thereby violates covenants given to the bondholders, such as are set forth above, and particularly N.J.S.A. 27:12B-9(a)(viii); N.J.S.A. 27:12B-14 and N.J.S.A. 27:12B-11.
The trustees contend that the provisions in the first paragraph of L. 1973, c. 370, quoted above, give the Governor and one other the equivalent of a power of veto over tolls and hence violate the covenants for security and their right to a remedy in case tolls are inadequate.
Plaintiffs concede that under the police power of the State, the State might be able to enact laws that would affect the rights of the holders of the bonds if such laws were necessary for the public good and were reasonable under the circumstances. They contend, however, that the subject law was not necessary for the public good and is unreasonable under the circumstances.
The Attorney General, in respect to the veto power, urges that
* * * the true security is to be found in the toll rate itself and the standards by which it is struck. The veto power invested in the *260 Governor by virtue of Chapter 370 of the Laws of 1973 does not touch this security in any fashion.
The Attorney General then urges that the effect of L. 1973, c. 370 is to change the persons who shall make decisions and that such a change does not violate constitutional guarantees where the means of payment remains intact. In this case he urges that § 711 of the various resolutions provide for the means of payment and the subject law does not affect that section. Therefore he concludes there has been no impairment of contract.
Authority urges that the trustees have failed to show that any purchaser of the bonds relied upon the covenants as to the independence of the Authority in purchasing their bonds; that any purchaser of the bonds has suffered loss due to the enactment of the subject legislation, or that § 711 rights will be interfered with in any manner, and hence the trustees have failed to show how their rights protected by the respective Constitutions have been violated.
The court will consider the following questions in the order stated below.
1. What is the test to determine whether a contract has been impaired?
2. Can the subject law be construed so that it does not impair any contract right?
3. If some portion of the statute does impair the contract rights of holders of existing bonds, is the remainder necessarily invalid?
4. Have the trustees made a sufficient showing to be entitled to judgment?

I.
The United States Supreme Court recently considered the test for violation of the Contract Clause in Allied Structural Steel Co. v. Spannaus, ___ U.S. ___, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). Justice Stewart wrote the opinion for a majority of five Justices. The majority held invalid *261 a Minnesota statute that required an employer with 100 or more employees who closed an office or plant in Minnesota to immediately purchase deferred annuities payable at age 65 for each employee terminated who had at least ten years service with such employer, including service prior to the effective date of the statute. Allied Steel had a pension plan which was qualified under § 401 of the Internal Revenue Code but which did not provide for vesting of rights in a manner to meet the standards of the Minnesota statute; hence, to close its office in Minnesota it would have had to spend $185,000 in the year the statute became effective.
Justice Stewart said:
There can be no question of the impact of the Minnesota Private Pension Benefits Protection Act upon the company's contractual relationships with its employees. The Act substantially altered those relationships by superimposing pension obligations upon the company conspicuously beyond those that it had voluntarily agreed to undertake. But it does not inexorably follow that the Act, as applied to the company, violates the Contract Clause of the Constitution.
The language of the Contract Clause appears unambiguously absolute: "No State shall ... pass any ... Law impairing the Obligation of Contracts," U.S. Const., Art. I, § 10. The Clause is not, however, the draconian provision that its words might seem to imply. As the Court has recognized, "literalism in the construction of the contract clause ... would make it destructive of the public interest by depriving the State of its prerogative of self-protection." W.B. Worthen Co. v. Thomas, 292 U.S. 426, 433, 54 S.Ct. 816, 818, 78 L.Ed. 1344.
Although it was perhaps the strongest single constitutional check on state legislation during our early years as a Nation, the Contract Clause receded into comparative desuetude with the adoption of the Fourteenth Amendment, and particularly with the development of the large body of jurisprudence under the Due Process Clause of that Amendment in modern constitutional history. Nonetheless, the Contract Clause remains part of the Constitution. It is not a dead letter. And its basic contours are brought into focus by several of this Court's 20th century decisions.
First of all, it is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States. "It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the *262 State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals." Manigault v. Springs, 199 U.S. 473, 480, 26 S.Ct. 127, 130, 50 L.Ed. 274. [___ U.S. at ___, 98 S.Ct. at 2720-2721, 57 L.Ed.2d at 733-734]
He continued:
If the Contract Clause is to retain any meaning at all, however, it must be understood to impose some limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power. The existence and nature of those limits were clearly indicated in a series of cases in this Court arising from the efforts of the States to deal with the unprecedented emergencies brought on by the severe economic depression of the early 1930's.[3]
*263 He further stated:
In applying these principles to the present case, the first inquiry must be whether the state law has, in fact, operated as a substantial impairment of a contractual relationship. The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation.
The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them. [___ U.S. at ___, 98 S.Ct. at 2723, 57 L.Ed.2d at 736-737]
Justice Stewart concluded that the aforesaid statute retroactively changed the company's contracts with its employees for vesting of pension rights in a substantial manner. There was no period of adjustment but immediate payment of $185,000 was required. There was no showing of any immediate general social problem to be met. The statute did not apply to all employers but only to those who employed 100 or more and also had established a pension plan.
Finally, he said:
It did not effect simply a temporary alteration of the contractual relationships of those within its coverage, but worked a severe, permanent and immediate change in those relationships  irrevocably and retroactively. Cf. United States Trust Co. v. New Jersey, 431 U.S. at 22, 97 S.Ct. at 1517 [___ U.S. at ___, 98 S.Ct. at 2726, 57 L.Ed.2d at 740]
Impairment may occur if either a right based upon a covenant is destroyed, Von Hoffman v. City of Quincy, 71 U.S. 535, 18 L.Ed. 403. (1867) (Illinois repealing statute *264 imposing a tax to pay for bonds and limiting the amount of taxes to be levied held invalid), or if a remedy is modified or altered to such an extent that the underlying right is meaningless for practical purposes. See the cases referred to in footnote 3.
In United States Trust Co. v. New Jersey, supra, a majority of four Justices of the seven participating held that a statute adopted both in New York and New Jersey which repealed an earlier statute prohibiting the Port Authority of New York and New Jersey from engaging in mass rail transit projects if a projected deficit would exceed one-tenth of the general reserve fund or 1% of the Port Authority's total bonded debt violated the Contract Clause.
* * * As a security provision, the covenant was not superfluous; it limited the Port Authority's deficits and thus protected the general reserve fund from depletion. Nor was the covenant merely modified or replaced by an arguably comparable security provision. Its outright repeal totally eliminated an important security provision and thus impaired the obligation of the State's contract. See Richmond Mortgage & Loan Corp. v. Wachovia Bank & Trust Co., 300 U.S. 124, 128-129, 57 S.Ct. 338, 81 L.Ed. 552 (1937). [431 U.S. at 19, 97 S.Ct. at 1516]
The law under the New Jersey Constitution is comparable. In Baldwin v. Flagg, 43 N.J.L. 495 (Sup. Ct. 1881), defendants moved to vacate a writ of attachment on real property issued in a suit on a bond secured by a mortgage on the grounds that L. 1881, c. 147, enacted March 23, 1881, barred suits on bonds secured by mortgages until the mortgage was foreclosed. The bond and mortgage were executed on August 26, 1880. The Supreme Court affirmed the denial of the vacation of the writ of attachment and held that the statute as applied to said bond violated the New Jersey Contract Clause.
The Baldwin court analyzed the purpose and effect of the 1881 act and concluded that the statute did alter contractual rights.
*265 The act, in effect, enlarges the time for the payment of the bond  the performance of the condition upon which it was made, for the indefinite period during which the foreclosure suit and the proceedings to effect a sale of the mortgaged premises may be pending.
The obligation of a contract is synonymous with the ability to enforce its performance. It consists in the power and efficacy of the law which applies to and enforces performance of it, or an equivalent for non-performance. Thus, if a party contracts to pay a certain sum on a certain day, the contract binds him to perform it on that day, and this is its obligation. 2 Story on Const., § 1378. It is perfectly clear that any law which enlarges, abridges, or in any manner changes the intention of the parties, resulting from the stipulations in the contract, necessarily impairs it, and the manner or degree in which this change is effected can in no respect influence the conclusion. Any deviation from its terms, by postponing or accelerating the period of performance which it prescribes, imposing conditions not expressed in the contract, or dispensing with the performance of those which are part of the contract, however minute or apparently immaterial in their effect upon it, impairs its obligation. [at 503]
In N.J. Highway Authority v. Sills, supra, in an action for a declaratory judgment by the bond trustees against the Attorney General, the court held two statutes permitting National Guard personnel and Army Reserve personnel driving to and from reserve training to travel the Parkway without paying tolls to be invalid under the New Jersey Contract Clause:
I have no doubt that if the statutes here in question are allowed to stand, they will impair the obligation of the contract with bondholders and their trustees. The position of every bondholder will have deteriorated to some extent. For a strong statement that the amount and extent of impairment is immaterial see 16 Am. Jur.2d "Constitutional Law" § 446 (1964), where many authorities are listed. The question appears to narrow down to this: Are the statutes such a valid exercise of the state's police power as to represent a permissible impairment?
The difficulty of defining the term "police power" hardly calls for comment. Many of the attempts at definition are mentioned in 16 Am.Jur.2d, "Constitutional Law" § 261 and 262 (1964), and footnotes. However, I think it unnecessary to consider whether Chapters 352 and 414 of the Laws of 1968 represent an exercise of the State's police power. Assuming that they do, they are unlike the emergency legislation of Hourigan, [v. North Bergen, 113 N.J.L. *266 143] Faitoute Iron & Steel Co. [v. City of Asbury Park, 127 N.J.L. 239] and Veix, [v. Sixth Ward etc., 310 U.S. 32, 60 S.Ct. 792, 84 L.Ed. 1061] the statutes dealt with in all three of those cases having been passed to relieve general and severe problems of the depression years. Chapters 352 and 414 have for their primary objective the conferring of personal benefits upon Guardsmen and Army Reservists. They are not an attempt to solve an emergency problem and are not addressed to any problem of state-wide importance as was the Texas legislation considered in City of El Paso. [Simmons, 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446] The State, of course, has a legitimate interest in having members of the National Guard and Army Reserve attend training sessions as well as an interest in persuading new members to join. Perhaps some small measure of the persuasion might be the prospect of toll-free passage to and from training sessions.
Chapters 352 and 414 of the Laws of 1968 are relatively unimportant pieces of legislation. Free passage on New Jersey toll roads for Guardsmen and Army Reservists who are going to or coming home from training sessions is not vital to them, to the plaintiffs or to anyone else. Mr. Justice Black, dissenting in City of El Paso, supra chided his colleagues of the majority with "balancing away the plain guarantee of U.S. Const. Art. I, § 10, that `No State shall * * * pass any * * * Law Impairing the Obligation of Contracts. * * *'" To do that "balancing" the majority, as noted above, pointed out the great importance to Texas of the legislation which had cut down to five years the previously unlimited right to reinstate defaulted contracts to purchase state lands. In my judgment City of El Paso will not support a holding that ordinary and relatively unimportant legislation can impair the obligation of contracts without conflicting with the constitutional prohibition against impairment, even though the degree is small or even slight. I conclude that the two statutes in question are not such products of the legislative power of the State of New Jersey that they can stand in the face of the constitutional prohibitions against impairment of contract obligations; and that they are unconstitutional. [111 N.J. Super. at 319-321]
The Supreme Court affirmed for essentially the reasons stated below. 58 N.J. 432 (1971).
The test for impairment under Art. IV, § VII, par. 3, of the New Jersey Constitution in respect to remedies is more explicit than that of the Constitution of the United States of America. The language states:
*267 The Legislature shall not pass any bill of attainder, ex post facto law or law impairing the obligation of contracts, or depriving a party of any remedy for enforcing a contract which existed when the contract was made.
In Radar v. Southeasterly Road Dist., 36 N.J.L. 273 (Sup. Ct. 1873), a statute repealing the act incorporating defendant road district and transferring all its property and contracts to the Township of Union was held valid against contention that it deprived contractors with road district of a remedy. The court held that, at most, the contractors would lose the costs in their then pending suit because of the need to sue the township.
In Rader Justice DePue gave the historical background for the insertion of the language in the last clause at the 1844 Constitutional Convention and further states:
This provision is peculiar to the constitution of this state and is regarded as having an important effect in restriction of the power of the legislature over remedies. Sedg. on Stat. and Const. Law 617 n. 656. [Id. at 278].
Justice DePue explained the purpose of this provision:
It is clear that any legislation, the effect of which is to deprive the party of the power to resort to the person or any property, which, as the law stood when the contract was made, might have been taken or applied in satisfaction of his demand, is within the constitutional prohibition. The evil at which this peculiar provision was mainly directed, was the construction put upon the provision of the constitution of the United States relative to the obligations of contracts, admitting the power of the state to pass laws abolishing imprisonment for debt, and exempting property from execution, and make such laws applicable to existing contracts, whereby the value of contracts in the ability to enforce performance was in many instances seriously impaired.
It is equally clear that the legislature may make laws which incidentally affect the pursuit of remedies for enforcing existing contracts; as, for instance, such as regulate the admission of evidence, the course of practice in the courts, the mode of conducting sales under judgments and executions, and altering the forms of action, or prescribing periods for the limitation of actions within a reasonable time. In this class may be included acts changing a *268 corporate name, or increasing corporate limits, and similar acts, altering or modifying in mere matters of form, the means of realizing the benefits of a contract, leaving the substance of the remedy unaffected. [at 280-281]
The language of the 1947 Constitution of New Jersey is identical to that of the 1844 Constitution.
Subject to the qualification about remedies based on the express language of the New Jersey Constitution, the Supreme Court of New Jersey, in its most recent consideration of the Contract Clause, has not indicated that New Jersey applies a different or narrower construction of the Contract Clause than that utilized by the United States Supreme Court. Cf. New Jersey Sports & Exposition Auth. v. McCrane, supra, 61 N.J. at 26-30.
As earlier noted, there is no question that the rights involved are contract rights within the meaning of the relevant constitutional provisions. The inquiry, then, is whether the statute substantially impairs those rights  and this inquiry should probably be stringent because the Authority in this context is a public agency  and whether its enactment was necessary and reasonable for some general purpose.

II
The Attorney General has urged that by proper construction the statute does not pose any constitutional questions. He urges that the provisions of L. 1973, c. 370, do not change or modify the provisions of § 711 of the bond resolutions. "Absent some emergency which would compel the full deployment of the police power, the Governor is committed by c. 370 of the Laws of 1973 to honor the conditions set forth in the 1.2 ratio." Further, he argues that the veto power of the Governor does not touch the security provided for in § 711 of the resolutions but only the minutes of meetings. Since the power to derive the revenues to meet debt service is undisturbed, "the legislative modification of the means for payment is deemed to be without constitutional significance."
*269 a statute changing the officers who make decisions concerning the collection and distribution of a bond fund do not violate the Contract Clause.[4]
The bondholders interest is not in who sets the tolls but in the adequacy of the tolls. The Attorney General intends that "the Governor is precluded from intervening in the decision-making process so as to upset or diminish the 1.2 ratio. He has not done so. In any case, he is bound by the 1973 amendment to honor the covenants such as Section 711 made by the Authority for bondholder security."
This argument suggests that if conditions arise under § 711 that require an increase in tolls, the Governor is under a mandatory duty to give his consent, at least as to toll adjustments to satisfy those conditions; hence, the statute has no significance.
There are two difficulties with the suggested construction. First, where consent of another must be obtained in advance of action by an official or body, the existence of that consent is a jurisdictional prerequisite to the official or body acting on the matter. Cf. Currie v. Atlantic City, 66 N.J.L. 140 (Sup. Ct. 1901). Even if the statute is construed as suggested, there is no time limit specified within which the prerequisite consent must be given. Second, the Legislature's use of the word "consent" indicates that the Governor and other officials were to have some active role.
*270 In West Point Island Civic Ass'n v. Dover Tp. Comm., 93 N.J. Super. 206 (App. Div. 1966), certif. den. 48 N.J. 576 (1967), the Appellate Division reversed a judgment dismissing an action by plaintiff to compel defendant governing body to adopt a resolution consenting to a portion of the township being annexed to another municipality, on ground that trial judge erred in ruling that the governing body had an absolute right to withhold consent for any reason.
In that case plaintiffs had obtained more than enough signatures of the homeowners and landowners required under N.J.S.A. 40:43-26 and brought action to compel the governing body to adopt a resolution consenting to the annexation. In relevant part the statute provides:
Such petition shall also have attached thereto a certified copy of a resolution of the governing body of the municipality in which said land is located, consenting to said annexation, which resolution said governing body is hereby authorized and empowered to adopt.
They urged that in contrast to N.J.S.A. 40:43-26, which applied to the governing body of the municipality to which the territory was to be added and stated "may, in its discretion" act, no discretion was left to the governing body and the governing body had a duty to consent.
The Appellate Division said:
* * * Consent to the petition by the governing body of the municipality of which the land is a part is a statutory sine qua non in the annexation procedure. If the Legislature had intended the giving of that consent to be a mere ministerial formality, it would have used clearer expressions of such intent. It would have "ordered" or "directed" such consent to be given, if the petition were found to be in order. When, instead, it merely "authorized and empowered" the governing body to adopt a resolution consenting to the annexation, the fair implication is that the Legislature was permitting, but not requiring the consent. The power to give or withhold that consent was vested in the governing body as the chosen representatives of all the people of the community. "Consent" itself implies a voluntary act, not statutory compulsion. Cf. C.I.R. v. Long's Estate, 304 F.2d 136 (9 Cir.1962), holding that a statute providing jurisdiction *271 to do an act does not by that fact alone mandate the doing of the act. [at 209-210]
Consent has usually been construed to mean the doing of an act voluntarily when a person has the right, power or will not to do so. Cf. State v. King, 44 N.J. 346, 352-356 (1965); Giroud v. New Jersey Mfrs. Cas. Ins. Co., 106 N.J.L. 238, 241 (E. & A. 1929).
The legislative statements attached to the bill which became the subject law indicate that the Legislature intended the Governor and one other designated official to have power and use it under the first paragraph of L. 1973, c. 370, quoted above on page 257.
The court has no doubt that any Governor of this State would act in good faith. But individuals of good faith can have reasonable differences of opinion. The time spent in litigation to resolve what is reasonable can be lengthy and time-consuming, particularly in respect to projected finances. See Helmsley v. Fort Lee, 78 N.J. 200 (1978).[5]
Review of the Sec. 711 provisions in the various resolutions, particularly the one dated July 27, 1971, show that those who acted on behalf of the bondholders sought and obtained a definite and precise method of dealing with the problem of inadequate toll revenue.
The Attorney General concedes that the method is fair and reasonable both as to the bondholders and as to the users of the Parkway.
Under the law as it now stands, if the Authority refused to act until it had the prior written consent of the Governor, and if § 711 dictated that tolls be adjusted, and if the *272 Governor had not consented, the Trustees would have to commence actions against both the Governor and Authority. Those acting for the bondholders obtained express covenants to avoid this problem.
In Patterson v. Carey, 41 N.Y.2d 714, 395 N.Y.S.2d 411, 363 N.E.2d 1146 (1977), the Court of Appeals reversed judgments of the lower courts upholding a statute rolling back toll increases initiated by a toll road authority and providing for a four-step review procedure before tolls could be increased in the future.
The Court of Appeals summarized the statutory and bond provisions for the revenue bonds issued by the authority.
* * * The authority issued bonds that were sold to the general investing public. In conjunction with the projected bond issue, the State adhered to its pledge, first made in 1939, not to limit or alter the rights vested in the authority to the detriment of holders of authority bonds issued after January 1, 1939. (Public Authorities Law, § 158-a). The Parkway reconstruction program was designed as a "self-liquidating" improvement; the cost of the project was to be borne by those who would benefit by it. To that end, the authority was empowered "[t]o charge tolls for the use of the part of the Southern state parkway improved by the authority subject to and in accordance with any agreements with bondholders made as hereinafter provided. The toll shall be ten cents unless the revenues from such tolls and the income from the facilities authorized by the foregoing provisions of this section are insufficient to meet all obligations of such agreements and to pay the costs of operating and maintaining the parkways and facilities operated and maintained by the authority pursuant to the foregoing provisions of this section. The revenue from such tolls and the income from such facilities shall be used only to meet such obligations and to pay the cost of constructing, reconstructing, operating and maintaining such parkways and facilities" (Public Authorities Law, § 153-b, subd. 5.) Toll receipts were pledged to secure the authority's obligation on its bonds. [Id. at 717, 395 N.Y.S.2d at 414, 363 N.E.2d at 1149-1150]
It said:
* * * The statute deprives the bondholders of property without due process of law in violation of the State Constitution. Further, the statute impairs the obligation of the State's own contract with *273 bondholders and, thus, violates the contract clause of the Federal Constitution.
In this case, the State granted to the authority the power to increase the toll on the Southern State Parkway and pledged not to limit or alter the rights vested in the authority to the detriment of the bondholders. (Public Authorities Law, §§ 153-a, 153-b, subd. 5.) Since the toll is the sole source of funds for bond repayment, any limitation on the authority's power to collect a toll sufficient to pay the bonds deprives the bondholders of an essential attribute of their contract with the authority and with the State and jeopardizes their investment. The statute under consideration suspends a toll increase imposed by the authority and conditions any future increases upon compliance with a complicated and time-consuming procedure. Bondholders were promised, as part of the arrangement which financed the reconstruction of the highway, that the authority could raise the toll if the authority, in its discretion, deemed an increase necessary to pay its operating expenses and meet its bond obligations. With the present statute, the Legislature has diminished the bondholders' rights by suspending one increase and limiting the authority's previously broad discretion to impose future increases. Thus, the statute has deprived the bondholders of a right granted by their contract with the authority and the State. [Id. at 720, 395 N.Y.S.2d at 416, 363 N.E.2d at 1151-1152]
In respect to the Contract Clause, it said:
The Federal Constitution bars the States from enacting legislation impairing the obligation of contracts. (U.S. Const., art. I, § 10.) In its covenant with the holders of authority bonds, the State pledged to vest the authority with the power to raise tolls, in its sole discretion, if toll revenues become insufficient to meet the obligations of indebtedness and to pay the costs of operating and maintaining the Parkway and related facilities. (Public Authorities Law, § 153-b, subd. 5.) The State also pledged not to limit or alter the rights vested in the authority to the detriment of authority bondholders. (Public Authorities Law, § 158-a.) Since toll revenues are the sole source of funds for bond-repayment, the provision granting the authority the power to increase tolls was an important security provision. Bondholders were guaranteed that the authority would have the necessary power to raise tolls in order to pay authority obligations. This, obviously, was no small concession, nor was it superfluous. A statute which conditions the authority's power to increase tolls upon compliance with a review procedure involving the intervention of others from outside the authority is a blow to the independence of the authority's *274 judgment. Intercession by others outside the authority is not what the bondholders contracted for.
* * * * * * * *
Just as abrogation of a debt limit threatened the rights of Port Authority bondholders, infringement upon the right to set a proper toll invaded the contractual rights of Jones Beach State Parkway Authority bondholders. It is not necessary that the impairment totally destroy the obligation of the contract. The extent of the impairment is, however, a relevant factor in considering the reasonableness of the impairment. (United States Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 27, 97 S.Ct. 1505, 1520, 52 L.Ed.2d 92, supra.) [Id. at 721-722, 395 N.Y.S.2d at 417-418, 363 N.E.2d at 1152-1153]
The subject provision in the statute in question does not shift the responsibility from making the decision to implement a change in tolls from one body to another body or person subject to the same standards as was the factual pattern in the cases noted in footnote 4. The subject provision imposes a pre-condition upon the performance of a duty owed to the holders of the bonds in the basic security for the payment of interest and principal.
If the only bonds in question were the ones subject to the unconditional guarantee of the payment of interest and principal by the State, then a court might be able to consider the impairment as insubstantial. The State's guarantee, however, does not apply to the 1971 Improvement Bonds. The computations to determine what toll revenues are adequate to service these bonds necessarily have to provide for the debt service on the earlier bonds; hence, the State's guarantee of those bonds for purposes of resolution of this matter as it presently stands is irrelevant.
The court concludes that the provisions of L. 1973, c. 370, stating that
No resolution or other action of the authority providing * * * for the fixing, revising or adjusting of tolls for the use of any highway projects or parts or sections thereof shall be adopted or otherwise made effective by the Authority without the prior approval in writing of the Governor and at least one of the following: the State Treasurer and the Comptroller of the Treasury * * * *275 does impair the contract rights of the holders of the bonds of the Authority heretofore issued in violation of the Contract Clause of both the Constitution of the United States and of the State of New Jersey, and particularly the provision of the New Jersey Constitution prohibiting "depriving a party of any remedy for enforcing a contract which existed when the contract was made." The aforesaid law does not provide an alternative remedy but injects an additional high hurdle to be cleared. The court further concludes that the impairment is substantial.
The only justification advanced, and the only evidence in support of the need and reasonableness, for the adoption of this statute is that the Governor has this power over other authorities.[6] There is no legislative finding that there is a general problem involving the public health, morals or welfare which this provision will solve. There are no facts before the court indicating such a situation.
As developed by the materials submitted and the arguments advanced, this is the only provision of the statute which has been questioned. It is the provision that is of concern to the trustees and to the bondholders whom they represent.
Regarding the trustees' argument that the other provisions of the subject act destroy the autonomy of the Authority, different considerations exist.
In the statement attached to the bill that became L. 1973, c. 370, it is said:
The New Jersey Highway Authority, whose primary function is to operate the Garden State Parkway but of late has also included *276 additional projects like the construction of the Garden State Art Center, is approximately a 1/2 billion dollar operation. * * * The importance of the projects under the jurisdiction of the State agency to the people of this State cannot be overstated. Its continued operation and development in a manner so as to serve the best interests of the State of New Jersey and its citizens is of the highest priority and therefore, to insure such operation and development, it must have its activities scrutinized by the only State officer elected by all the people of this State, the Governor.
The reports of the Authority submitted to the court show that the Garden State Arts Center presents artists of both international and national reputation in dance, ballet, in both popular and classical music, and in entertainment generally. It operates close to a break-even point and is assisted by fund-raising activities of third parties to meet the deficit.
The need for the State to prevent Authorities, which rely upon revenues to pay indebtedness, from engaging in collateral projects which may not only jeopardize their finances but also undertake functions which the State has assigned to other institutions, is a need of the public in general to see to the orderly utilization of state resources.
To the extent that the other sections of L. 1973, c. 370, may impair covenants that there will be no other supervisory body over the Authority, this court finds such an impairment not to be substantial and to be for a public need and thus reasonable.

III
Except for correcting the name of the Executive Department in which the Authority is located and the effective date of the act, L. 1973, c. 370, only contains the original provisions of § 4 and of the two paragraphs quoted above. It does not contain a severability clause. It was enacted as an amendment to L. 1952, c. 16. N.J.S.A. 27:12B-1 et seq.
N.J.S.A. 27:12B-25 provides:
*277 If any provision of this act or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or application of the act which can be given effect without the invalid provisions or applications and to this end the provisions of this act are declared to be severable.
In Affiliated Distillers Brands Corp. v. Sills, 56 N.J. 251 (1970), same case following remand 60 N.J. 342 (1972), our Supreme Court held that an entire section of the amendatory statute dealing with exemption for grandfather licenses rather than a portion thereof had to be invalidated.
In respect to severability the Supreme Court said:
Severability is a question of legislative intent. That intent must be determined on the basis of whether the objectionable feature of the statute can be excised without substantial impairment of the principal object of the statute. 56 N.J. at 265; N.J. Chapt., Am. I.P. v. N.J. State Bd. of Prof. Planners, 48 N.J. 581, 593, appeal dismissed and cert. denied, 389 U.S. 8, 88 S.Ct. 70, 19 L.Ed.2d 8 (1967); Angermeier v. Borough of Sea Girt, 27 N.J. 298, 311 (1958). To justify severance of a part of a statute "there must be such a manifest independence of the parts as to clearly indicate a legislative intention that the constitutional insufficiency of the one part would not render the remainder inoperative." Washington National Ins. Co. v. Board of Review, 1 N.J. 545, 556 (1949); Yanow v. Seven Oaks Park, Inc., 11 N.J. 341, 361 (1953).
* * * * * * * *
In view of the proofs that a large number of "grandfathers" holding a substantial volume of the business would be adversely affected by a decision that the "grandfather clause" was severable, we cannot say with assurance that the Legislature would have intended the remainder of the statute to stand alone. Where there is doubt, as here, we believe that we should treat the paragraph as an entity rather than sever the offending part. Were we to do otherwise, we might usurp the legislative function of lawmaking. See N.J. Chapt., Am. I.P. v. N.J. State Bd. of Prof. Planners, supra, 48 N.J. at 594. [60 N.J. at 345-346]
Analysis of L. 1973, c. 370, shows that the Legislature's basic objective was to control future activity of the Authority and that it expresses a desire not to interfere with existing rights of bondholders, although this court has concluded that it has that effect in respect to outstanding bonds.
*278 Even without a severability clause, this court concludes that the portion of the statute which is invalid may be severed because the remainder is consistent with the aim of the Legislature to regulate future activity of the Authority and is independent of the invalid portion.
The trustees represent bondholders who have a right to receive principal and interest only. Bondholders, unlike stockholders, have no right to select management or control management's action except as set forth in the debt instruments. When the debts are paid, those limitations will be extinguished. If potential investors find the law objectionable, they may refuse to invest.
However, during the existence of the debts under the various resolutions heretofore adopted, any veto of any action, such as the appointment of traffic consultants to do the work required under § 711 or to provide the insurance required under § 712, would be invalid as a violation of the Contract Clause in that it would deprive the bondholders of essential security by means of applying a subsequently enacted statutory power. To the extent that the second paragraph of the statute may be read to authorize the violation of such an express covenant as the provision for insurance, this court holds that such provision if so construed and applied would violate the Contract Clause.
Even if invalid on such an application to the security provisions of the various resolutions, this court concludes that such an application may be treated as severable and that portion of the statute held valid for the reasons heretofore stated.

IV
The question to be answered herein is the one posed by the Authority, namely, whether the trustees must show specific bondholders relied on the covenants in question to be entitled to judgment. The court's conclusions heretofore stated establish that the rights of the bondholders for whom *279 the trustees act are violated by the subject law. There is no need to restate the conclusions in III, supra.
In respect to the failure of the trustees to show that any bondholder purchased his, her or its bonds in reliance upon the covenants broken, the court concludes that under the circumstances of this case that is not necessary.
In N.J. Highway Authority v. Sills, supra, in the second action before the trial court, the judge agreed with the factual argument of the intervening reservists that the loss of $27,000 annually to the Authority would not cause an event of default. However, the judge did not accept their legal argument that the small dollar value of the impairment to each bondholder therefore saved the statutes permitting reservists to travel the roads without pay toll from being invalid.
I have no doubt that if the statutes here in question are allowed to stand, they will impair the obligation of the contract with the bondholders and their trustees. The position of every bondholder will have deteriorated to some extent. For a strong statement that the amount and extent of impairment is immaterial see 16 Am.Jur.2d "Constitutional Law" § 446 (1964) where many authorities are listed. * * * [111 N.J. Super. at 319]
Although there is some discussion of reliance in a few of the cases arising under the Contract Clause, under the circumstances of this case the court concludes that the absence of any evidence that a particular bondholder relied upon the provisions of § 711 in purchasing bonds is not significant in this case in determining "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." Allied Structural Steel Co. v. Spannaus, supra, ___ U.S. at ___, 98 S.Ct. at 2723, 57 L.Ed.2d at 736.
Those who acted for the bondholders in connection with the 1971 Improvement Bonds by the language used in § 711 focused on the problem of speedy adjustment of toll revenues. They provided that if adjustments were not made, then upon *280 application of holders of 10% in principal amount of bonds, the trustee must institute legal action. Under the default provisions of earlier bonds the trustee is not required to act upon application of holders of less than 25% of the principal amount of bonds. This is a significant difference, particularly since the 1971 Improvement Bonds are not guaranteed by the State.
The court concludes that the trustees have made an adequate showing to be entitled to judgment.
The Attorney General has not conceded that the statute is unconstitutional, as he did in the first action in New Jersey Highway Authority v. Sills, supra. The fact that the Legislature has enacted several similar statutes applicable to other authorities which have issued revenue bonds convinces the court that the question is substantial. The Attorney General may appear in all cases where statutes are questioned on constitutional grounds. R. 4:28-4. He did appear and filed an answer basically designed to defend the power of the Governor. The court concludes that there is jurisdiction to enter an appropriate judgment declaring portions of L. 1973, c. 370, invalid as violating the Contract Clause for the reasons stated above.
Counsel for Trustees shall submit an appropriate judgment[7] and advise the court whether they shall waive the claim for damages.
NOTES
[*] Series A and B are guaranteed by the State of New Jersey as to punctual payment of principal and interest on principal amount not exceeding $285,000,000 when same is due. L. 1952, c. 17. Means for payment are provided in § 5 of said act. The New Jersey Supreme Court held that act valid. Behnke v. New Jersey Highway Auth., 13 N.J. 14 (1953).
[**] Retired by issuance of Series F bonds.
[1] Series A and B are guaranteed by the State of New Jersey as to punctual payment of principal and interest on principal amount not exceeding $285,000,000 when same is due. L. 1952, c. 17. Means for payment are provided in § 5 of said act. The New Jersey Supreme Court held that act valid. Behnke v. New Jersey Highway Auth., 13 N.J. 14 (1953).
[2] A. Senate Statement

This bill provides that no resolution or other action by the New Jersey Highway Authority for the issuance or refund of bonds or other obligations or for the fixing, revising or adjusting of tolls shall be adopted without prior approval of the Governor and either the State Treasurer or the Comptroller of the Treasury.
The bill further provides that the Governor may veto any action taken by the authority, except action to negotiate or execute a collective negotiation agreement with a certified public employee organization representing employees of the authority, for 10 days after a copy of the minutes of a meeting of the authority have been delivered to the Governor.
B. Sponsor's Statement
The purpose of this bill is to give the Governor veto power over certain activities of the New Jersey Highway Authority. It would require that the minutes of the meeting of the authority be transmitted to the Governor. If he disapproved of action of the authority, he would then have 10 days (Saturdays, Sundays and holidays excepted) to return the minutes with his objection, if he so chose. If approved by the Governor prior to end of the 10 days the minutes would have force and effect when so approved.
The Governor already has this power over the activities of the New Jersey Turnpike Authority, the Delaware River Port Authority and the New York Port Authority, each of which is as important if not more important than the Highway Authority. There is no rational basis for continuing this inconsistency that now exists in our law.
The New Jersey Highway Authority, whose primary function is to operate the Garden State Parkway but of late has also included additional projects like the construction of the Garden State Art Center, is approximately a 1/2-billion dollar operation. The Garden State Parkway traverses 144 miles on its north-south route along the coast of New Jersey and is the main link between our fast-growing shore areas and the heavily populated northeastern section of the State and the country. The importance of the projects under the jurisdiction of the State agency to the people of this State cannot be overstated. Its continued operation and development in a manner so as to serve the best interests of the State of New Jersey and its citizens is of the highest priority and therefore, to insure such operation and development, it must have its activities scrutinized by the only State officer elected by all the people of this State, the Governor.
Such scrutiny would in no way impede the activities of the authority nor would it in any way affect the interests of the investors in the authority. It would however result in a greater degree of coordination between the development of authority projects and the needs of the people of this State.
[3] Cases analyzed were Home B. & L. Ass'n v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934) (statute authorizing events, during a defined emergency period with a terminal date, to extend period for foreclosure and redemption of mortgages on conditions providing for mortgager to pay rental value to cover taxes, insurance and interest on debt, was valid as to preexisting mortgages); W.B. Worthen Co. v. Thomas, 292 U.S. 426, 54 S.Ct. 816, 78 L.Ed. 1344 (1935) (statute authorizing in effect a delay in mortgage foreclosure proceedings for up to six years without any payments by mortgagor to mortgagee and reducing incentives for prompt payment, and which statute had no termination date, was invalid as to preexisting contracts); Treigle v. Acme Homestead Ass'n, 297 U.S. 189, 56 S.Ct. 408, 80 L.Ed. 575 (1936) (statute modifying law requiring directors of savings and loan associations to devote 50% of accounts collected to a fund to retire shares of withdrawing members outstanding for more than 60 days, to allow directors to use such funds to meet current expenses, payments on current shares or to retire shares of withdrawing members, was invalid as to holders of preexisting shares). He concluded by an analysis of United States Trust Co. v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), and pointed out that where a state attempted to modify its own contracts the court would examine the case "stringently." ___ U.S. at ___, 98 S.Ct. at 2721-2722, 57 L.Ed.2d 734-736.
[4] Reppel v. Board of Liquidation, 11 F. Supp. 799, 804 (E.D. La. 1935); Rorick v. Board of Comr's, 57 F.2d 1048, 1063 (N.D. Fla. 1932), vacated on jurisdictional grounds, 307 U.S. 208, 59 S.Ct. 808, 83 L.Ed. 1242 (1939); Hall v. Underwood, 258 Ala. 392, 63 So.2d 683, 692-694 (Sup. Ct. 1953); State ex rel. Urquhart v. Johnson, 107 Fla. 624, 145 So. 880, 882 (Sup. Ct. 1933); State ex rel. Porterie v. Walmsley, 183 La. 139, 162 So. 826, 838-840 (Sup. Ct. 1935) app. dism. 296 U.S. 540, 56 S.Ct. 141, 80 L.Ed. 384 (1935); Askew v. Smith, 126 S.C. 159, 119 S.E. 378, 379 (Sup. Ct. 1923) cf. California Highway Comm'n v. Ballard, 77 Cal. App. 404, 247 P. 527, 531 (D. Ct. App. 1926); Board of Ed. v. Dixson, 202 Okl. 110, 210 P.2d 669, 670 (Sup. Ct. 1949).
[5] Neither the trustees nor defendants have referred to L. 1977, c. 361, found in N.J.S.A. 27:12B-14.1 and 2, requiring notice and public hearing before toll increases may be implemented. The court makes no comment thereon other than to note that the statement attached to that bill in the Legislature recites that Authority construed then existing law to require the Governor and one other to approve toll increases.
[6] The provision in the law for the Governor to veto minutes of the Port of New York and New Jersey Authority was part of the legislation as originally enacted. N.J.S.A. 32:1-1 et seq. That situation does not present a Contract Clause problem because the power existed before the bonds were issued. Authority has referred to a number of other statutes which have been enacted over the years giving the Governor the same powers over other authorities. These statutes are not involved in this case.
[7] While this decision was being typed, the parties hereto filed a stipulation that all bonds issued under the July 7, 1971 resolution had been retired; hence, Midlantic National Bank no longer had any bondholders for whom it acted. The court decided not to edit the opinion to reflect this. However, it will not be a party to settle the form of any final judgment.