THE STATE, EX REL. CHARLES T. WARNER, PROSECUTOR,
v. ROBERT L. HOAGLAND ET AL.

1. The office of the Classification act of 1882 (*Rev. Sup*, p. 506), dividing cities into classes on the basis of population, is to provide a classification as a rule of construction for the convenience of municipal legislation.   A statute framed in compliance with that act will be construed accordingly, and upon such a construction the question will arise whether the classification adopted is such in substance as to bring the statute within the category of general laws.

2. Population may be made the basis of classification in statutes relating to municipal bodies and their police powers, but such a classification cannot be made the means of evading the constitutional interdict of local or special laws where the classification is plainly illusory.

3. An act passed February 14th, 1888 (*Pamph. L.,* p. 88), provided that the opening, construction, care, cleaning, repairing, alteration and improvement of roads, streets, avenues, lanes, alleys and parks, and of public sewers and drains, should be vested exclusively in the common council or board of aldermen, and that all assessments then unpaid for street or sewerage improvements should be collected by the collector or other officer having charge of the collection of taxes.   The act applied to all the cities of this state except cities of the first class.   Cities of the first class, by the Classification act of 1882, were those having a population exceeding 100,000.   *Held,* that for the purposes of this legislation the classification was legitimate, and the act was not in conflict with the constitutional provision on the subject of local or special laws.

4. The act provided that none of its provisions should take effect in any city until accepted by a majority of the legal voters of such city at a popular election.   *Held* (1), that this was not a delegation of legisla-

tive power; and (2), that the law was not made thereby a local or special law.

5. The act abolished the office of every officer, commission or board having any of the powers mentioned in the act, in any city accepting the act. *Held*, that abolishing the offices of other officers having the jurisdiction and powers conferred on the common council or board of aldermen was cognate to the object of the act, and that the purpose to abolish such offices need not be expressly mentioned in the title of the act.

6. In the city of New Brunswick, which accepted the act, commissioners of sewers, under a local statute, had power to issue bonds pledging the credit of the city to borrow money to pay the expenses of city improvements, and to make assessments for benefits, which assessments were pledged for the payment of such bonds. The commissioners had made and issued such bonds to a considerable amount. *Held* (1), that neither the validity of the bonds made by the commissioners nor the pledge of assessments to secure the payment thereof was affected by abolishing the office of the commissioners; and (2), that the commissioners were not guardians of the rights of the city's creditors, and could not, as representatives of such creditors, prevent the state from abolishing their office.

On application for a *mandamus.*   On rule to show cause.

By an act entitled "An act concerning the construction, care and improvement of the public ways, parks and sewers in certain of the cities of this state, and assessments for the same," passed February 14th, 1888 (*Pamph. L., p.* 88), it was enacted that in each of the cities of this state, excepting cities of the first class, the opening, construction, care, cleaning, repairing, alteration and improvement of the roads, streets, avenues, lanes, alleys and parks, and of the public sewers and drains within the corporate limits thereof, should be vested exclusively in the common council or board of aldermen of such city.

Section 3 provided that any officer, commission or board (other than the common council or board of aldermen) now possessing any of the powers mentioned in the first section of the act in any of the cities aforesaid should, as soon as this act should take effect in such city, cease, determine and be abolished; and that all assessments then remaining unpaid for

street or sewerage improvements in such city should be collected for the use of said city by the collector or other officer having charge of the collection of taxes, with the same power and authority for the collection of such assessments, by sale of land or otherwise, theretofore possessed by the officer, board or commission so abolished.

The seventh section provided that all acts and parts of acts, both general and special, inconsistent therewith, should be repealed, with a proviso that none of its provisions should take effect in any city until the acceptance thereof should have been submitted to a popular vote, and that the legal voters of said city might, at such election, decide upon the acceptance or rejection of the act, and that if there should be a majority of ballots in favor thereof, but not otherwise, the act should take effect in such city immediately.

The eighth section provided that the act should take effect immediately as regards the submission thereof to popular vote.

By special act of the legislature, approved March 23d, 1871, entitled "An act appointing commissioners of streets and sewers in the city of New Brunswick," the office of commissioners of streets and sewers was created. To this official body was committed the sole and exclusive power of directing and causing streets to be graded and improved and sewerage works to be constructed, and of making assessments therefor on property benefited, with power to collect the assessments by the sale of lands. The act provided that the assessments should be entered in books to be kept by the commissioners, to be designated "Books of Assessments for Streets and Sewers," and that transcripts thereof should be conclusive evidence of such assessments. In addition to the powers conferred on the commissioners for the execution of public improvements, and the making and collection of assessments, the board was authorized to make and issue, in the name of "The Commissioners of Streets and Sewers in the City of New Brunswick," improvement bonds under the hands of the commissioners and under the seal of the commission, pledging for the redemption thereof the faith and credit of the city, for the purpose of

paying the cost and expenses of the improvements authorized by the act. To provide for the redemption of these bonds the commissioners were required to invest the assessments, when collected, in certain stocks or bonds, to be deposited in bank to the credit of the sinking fund—the interest accruing thereon to be subject to draft by the commissioners, the principal to be applied by the bank to the redemption of the improvement bonds. *Pamph. L.* 1871, *p.* 795.

The respondents were elected and qualified as commissioners for terms, respectively, which had not expired when the act of 1888 was passed. Assessments for benefits aggregating a considerable sum, made by the commissioners, are still due and unpaid, and improvement bonds issued by them to a large amount are outstanding, and bonds in which assessments collected were invested by the commissioners are now on deposit in bank for the redemption of the improvement bonds so issued.

The act of February 14th, 1888, was submitted to a popular vote at a charter election on April 10th, 1888, and accepted, a majority of ballots being in favor thereof. The election and acceptance and all proceedings relating thereto were in compliance with the act.

The relator is collector of taxes, the officer having in charge the collection of taxes in New Brunswick. He applies for a *mandamus* to obtain the books containing the record of unpaid assessments kept by the commissioners under the act of 1871.

Argued at June Term, 1888, before Justices DEPUE, VAN SYCKEL and DIXON.

For the relator, *A. H. Strong.*

*Contra, A. V. Schenck.*

The opinion of the court was delivered by

DEPUE, J. The act of 1888, on which the relator founds his right to the possession of these records, abolished the office of the respondents and transferred its duties to the relator.

The respondents resist the application, and contend that the act of 1888 is unconstitutional and void.

The act thus drawn in question excepts from its operation " cities of the first class." It is insisted that for this reason it is a special and local law regulating the internal affairs of cities. The classification of cities was made by the act of March 4th, 1882. *Rev. Sup., p.* 506. That statute divided cities into four classes—cities of the first class, consisting of those having a population exceeding one hundred thousand ; cities of the second class, those having a population not less than twelve thousand nor more than one hundred thousand ; cities of the third class, consisting of those not embraced within either the first or second classes, excepting cities on the Atlantic ocean which are sea-side or summer resorts, the cities thus excepted being designated as cities of the fourth class.

The scope and purpose of the Classification act of 1882 has been a subject of misapprehension which has occasioned some faulty legislation. The act, properly construed, does not purport to establish an absolute rule to discriminate between classifications which are admissible under the constitutional provision and those forbidden by its interdict. The office of the act is to provide a classification for the convenience of municipal legislation, analogous to the interpretation clauses frequently inserted in statutes, or general acts, assigning a meaning to particular words or a particular construction to statutory expressions, such as the general act relative to statutes. *Rev., p.* 1120. The third section, which declares that laws referring to cities under the classification therein made shall be construed to apply to and embrace all cities within that classification, clearly indicates the purpose to be that of statutory construction. Assigning to the act of 1882 its appropriate office, the result will be that the statute under consideration will read as excluding from its operation cities having a population exceeding one hundred thousand inhabitants ; and upon such a rendering, the question will arise whether the classification adopted is such, in substance, as to bring this act within the category of general laws.

It is incontestable at this day that population may be made the basis of classification in statutes relating to municipal bodies and their police powers. The power of the legislature to legislate within that sphere on a classification on the score of population has been set at rest by two recent decisions. I refer to *Randolph* v. *Wood,* 20 *Vroom* 85, which was affirmed by the Court of Errors (21 *Id.* 175), the opinion of Mr. Justice Knapp in the Supreme Court being adopted as the opinion of the court, and *State, Hart, pros.,* v. *Scott,* 21 *Id.* 585, decided by the Court of Errors by a unanimous vote, the opinion of Mr. Justice Van Syckel in that case being the opinion of the entire court.

Randolph *v.* Wood was decided upon an act entitled "An act concerning cities of the third class," approved April 20th, 1883 (*Rev. Sup., p.* 527, § 129), and framed in compliance with the Classification act of 1882. It enacted that in cities of the third class the term of office of the legislative body should be for as many years as there were members from each ward, and provided for so classifying members that the term of one member from each ward should expire each year, and one member from each ward should be elected for each year. The act wrought a radical change in the organization of cities within its purview, and was conspicuously a regulation of internal affairs; and in the Classification act of 1882, cities of the third class were those with a population of less than twelve thousand, excluding cities bounding upon the Atlantic ocean which were sea-side or summer resorts. The act was upheld by this court and the Court of Errors as a constitutional exercise of legislative power. In State, Hart, pros., *v.* Scott, the section in question prescribed the minimum fees for licenses to sell liquors, graduated by a classification upon population, $100 being the minimum fee in municipalities having a population of not more than three thousand; $150 in municipalities having a population exceeding three thousand and not exceeding ten thousand, and $250 in municipalities with a population in excess of ten thousand. It was conceded that this section was a regulation of the internal affairs of

towns and cities. The classification on which it was founded
was sustained.

It must not be inferred from these decisions that classifica-
tion on the basis of population may be resorted to as a means
of evading the constitutional interdict of local and special
laws, where the classification is plainly illusory. Mr. Justice
Knapp, in dealing with the case then in hand, states the prin-
ciple in these words: "A law is to be regarded as general
when its provisions apply to all objects of legislation, distin-
guished alike by qualities and attributes which necessitate the
legislation or to which the enactment has manifest relation.
Such law must embrace all and exclude none whose condition
and wants render such legislation equally necessary or appro-
priate to them as a class." He states the question for decision
to be whether, for the purpose of legislation, enlarging the
term of office of councilmen, smallness of population may not
be a substantial and sufficiently important ground to distin-
guish such communities from the great cities of the state, and
answers it in the affirmative, assigning as a reason therefor
that the duties of such office in small cities were measurably
small; that such offices in small cities were avoided by proper
men; that unless the duty which election to public office en-
forces is imposed for a considerable term, competent and ex-
perienced service is not likely to be obtained, and that in this
larger cities differ. He adds: " That if these or other con-
siderations justify the drawing of some line of demarcation
between the larger and smaller aggregations of people, it is for
the legislature to say where that line shall be placed. I am
not prepared to say that the selection of the smaller munici-
palities from the whole, as the objects to which this legislation
shall apply, is so inappropriate that we may deny to the legis-
lation based upon it the quality of a general law."

In State, Hart, pros., *v.* Scott, Mr. Justice Van Syckel
declared that the diversity created by the section under con-
sideration would be fatal to its validity unless the basis of
classification was substantial. He continued : " Whether the
basis of classification is wise or judicious, or whether it will

operate as fairly as some other basis that might be adopted, is a question for the legislature and not for the courts. The extreme limit of our inquiry in this direction is, does population bear any reasonable relation to the subject to which the legislature has applied it; is it germane to the law?" After referring to the practice under the pre-existing laws to regard density of population in fixing the license fees, and the fact that where the population is dense the business would likely be more profitable than in sparsely settled districts, and the increased expense of maintaining the police department in populous districts, he declared that no more suitable basis of classification which the legislature could have selected for itself had suggested itself to him during his consideration of the subject.

The act applies to cities of the second, third and fourth classes. At this time Newark and Jersey City are the only cities excepted. In respect of population, these cities rank among the cities of this state as a class by themselves. The large population in these municipalities, the great amount of property to be protected by the municipal government, the extent and cost of local improvements necessary to the growth and prosperity of these cities require efficient and expensive city governments. The affairs of these municipalities could not be managed by local governments adapted to cities of the population and insulated position of the smaller cities of the state, and it would be oppressive to force upon the latter municipalities a local government such as is essential to public welfare in these two cities. On considerations of this kind in sister states having constitutional restrictions on special laws like that in our constitution, the courts have sustained classification acts similar to the act of 1882. *Wheeler* v. *Philadelphia*, 77 *Penna. St.* 338, 350; *Kilgore* v. *Magee*, 85 *Id.* 401; *Walker* v. *Cincinnati*, 21 *Ohio St.* 15; *State* v. *Powers*, 38 *Id.* 54, 61; *State* v. *Brewster*, 39 *Id.* 653, 659; *Bronson* v. *Oberlin*, 41 *Id.* 476, 481; *State* v. *Hawkins*, 3 *West. Rep.* 125, 128; *State* v. *Hudson*, *Id.* 159.

The legislation in question comprises the entire scheme of

public improvements in streets, avenues, parks and sewers, including assessments for such improvements. It embraces duties which constitute the principal functions of municipal government. In either of the excepted cities the expenditure for such purposes for a single year exceeds the entire taxable valuations in some of the minor cities of the state. In those two cities the performance of these public duties is parceled out and a considerable portion of them committed to officers or boards, some of whom are independent officials, and the revenues derived from assessments pass into the hands of commissioners as a fund for the redemption of municipal indebtedness beyond the control of the legislative department of the city government. This act vests sole and exclusive jurisdiction over these matters in the common council or board of aldermen, and abolishes every other office, commission or board, having previously any power or jurisdiction in the premises. Provisions, such as this act contains, may be suited to the wants and necessities of cities of the limited magnitude to which the act applies. Applied to cities of the magnitude of the excluded class, as exemplified in Newark and Jersey City, the act would disarrange the whole system of public improvements and be productive of much harm. Classification on the basis of population being legitimate, reasons for sustaining the classification in this act exist of much greater weight than those which influenced the decision in Randolph *v.* Wood. The validity of this act cannot be denied without overruling that case.

It was also objected to the act that it was not a constitutional exercise of legislative power, in that the act did not take effect in any city within its purview unless accepted on a popular vote. Acts of parliament to take effect on similar conditions are found in the English law, and have been put in force without scruple. The act of 22 *Geo. III., ch.* 83, popularly known as Gilbert's act, is an illustration of this sort of legislation very like the present act in this particular. It propounded a new and elaborate scheme for the support and employment of the poor, for adoption within any parish, town-

ship or place, on the approbation of two-thirds of the owners or occupiers of lands at a public meeting to be called for that purpose. It also authorized two or more parishes, townships or places to unite in adopting the act, and provided that the parishes, townships or places so uniting should, from and after they should have adopted the act, become a body politic and corporate for the purposes of the act. The act then provided that every parish, township or place adopting it should have all the power and authority it conferred. It repealed a prior statute (9 *Geo. I., ch.* 7), with respect to places in which the act should be adopted, and enacted that none of its provisions should extend to or affect any parish, township or place which did not adopt it. 8 *Evans Stat.* 90. In a series of acts of parliament which are cited in 7 *Jac. Fish. Dig.* 10, 175, agreement to adopt and acceptance are made conditions on which acts of parliament take effect in localities to which they extend. In all the litigations over poor rates and poor laws, and they are not few, no intimation has been made of a doubt that these acts were laws enacted in parliament. Corporations are organized under the General Corporation act by a certificate filed by the corporators. Corporators filing the certificate do not create the corporation. On such a certificate as the legislature has prescribed being filed, the corporation comes into existence by the legislative will. Private corporations can only be created by the co-operation of the corporators and the legislature. Statutes such as the act of 1888 are either grants of additional powers, or restrictions on powers previously possessed, or alterations in the manner in which corporate powers shall be exercised. In either sense such acts are in effect supplements to charters. A provision in a municipal charter, or in a supplement to it, that it should not take effect unless accepted by the inhabitants, is not a delegation of legislative power. The acceptance is submitted to the inhabitants of the municipalities as corporators, and not as a sovereign part of the people, and their vote is an act of acceptance, and not of legislation. *Paterson* v. *Society*, 4 *Zab.* 385, 396 ; 1 *Dill. Mun. Corp.*, § 23 and note.

Under this head it was insisted that the act is local and special, for the reason that unless accepted by all the cities within its purview a diversity in municipal government will ensue. It will be observed that it is not a constitutional requirement that the laws regulating the internal affairs of municipalities shall be uniform. The interdict is upon the legislature that it shall not pass local or special laws regulating the internal affairs of municipalities. Prior to the adoption of the constitutional amendment it was a fundamental principle of legislation that a grant of municipal or police powers might be conditioned upon acceptance, and that a municipal corporation might be created or an additional grant of franchises be made subject to acceptance or rejection by the people for whose government the municipality was created or additional franchises were proposed. Legislation of this character was a constitutional exercise of the sovereign power of legislation before the constitutional amendments were adopted. A purpose to withdraw from the legislature its prerogative in its discretion to submit such legislation to be accepted or rejected by the people to be affected by it will not be implied in the absence of a clear expression of such a purpose. The legislative prerogative may stand, and full effec be given to the constitutional limitation. If the law be a general law, within the meaning of the constitution, the power of the legislature has been exercised within constitutional limitations, and it is self-evident that if the legislature may submit a law for acceptance, a law based upon a valid classification, and submitted to all of the class that may accept it, is a general law, and its generality is not detracted from though some may not choose to accept it. Every law conferring discretionary powers may occasion diversities. The infirmity is not in the law. Diversity arises from the execution of it.

To sustain the construction that a law general in form is special if submitted to acceptance on a popular vote, the respondents rely upon *Scranton* v. *Lackawanna Iron and Coal Co.*, 4 *Cent. Rep.* 311. Elsewhere it has been held to the contrary. *People* v. *Hoffman*, 3 *West. Rep.* 523, and cases

cited.   In this state both the questions above stated have been settled adversely to the respondents by a recent decision of the Court of Errors.   *Paul* v. *Gloucester County*, 21 *Vroom* 585 ; *S. C.*, 15 *Atl. Rep.* 272.

In the third place, it was insisted that the object of the act was not sufficiently expressed in its title.   The title of the act is, "An act concerning the construction, care and improvement of the public ways, parks and sewers in certain of the cities of this state and assessments for the same."   This title embraces every object to which the act relates.   The precise objection on this head is that it also abolished offices, boards and commissions theretofore exercising the powers granted by the act to the common council or board of·aldermen.   The act of 1888, being a general law, of its own force operated to repeal all inconsistent legislation (*Bowyer* v. *Camden*, 21 *Vroom* 87), and taking from other bodies the jurisdiction conferred on the common council is not foreign to the object of the act, but is manifestly cognate to it.   *Payne* v. *Mahon*, 15 *Vroom* 213 ; *Bumsted* v. *Govern*, 18 *Id.* 368, 375 ; 19 *Id.* 612.

Another constitutional objection raised related to the effect of this law upon the city of New Brunswick.   By the act of 1871, which created the office of the relators, the commissioners were empowered to make and issue bonds in their official name, and pledge the credit of the city for their payment; and assessments made by them were required to be invested for the payment of such obligations.   It is insisted that the act of 1888 conflicts with the rights of creditors holding these bonds.   Creditors holding bonds issued by the commissioners have no security for payment beyond the credit of the city and the pledge of assessments.   These bonds are obligations of the city, and are enforceable against the city, notwithstanding the repeal of the law under which they were issued ; and assessments pledged for their payment may be made available at the instance of creditors, notwithstanding a change in the official body having the collection of them.   A change in the mode in which creditors' rights are to be enforced, which does· not affect any substantial right, is no infringement of the con-

stitutional rights of creditors. *Munday* v. *Rahway*, 14 *Vroom* 338; 15 *Id.* 395; *United Companies* v. *Weldon*, 18 *Id.* 59. Nor are the respondents constituted the guardians of the rights of the city's creditors. They cannot, as representatives of the city's creditors, protect their official existence from the power of the state to abolish their office. *State, Hall, pros.,* v. *Parker,* 4 *Vroom* 312; *Hines* v. *Freeholders of Essex*, 16 *Id.* 504.

The case was argued exclusively on the constitutional questions we have considered, probably with a view to a speedy decision of this controversy on the merits. We find no constitutional grounds on which to deny the validity of the act of 1888.

A technical question, however, stands in the way of allowing the relator a *mandamus* at this time.

The act of 1888 is a public act, and subject to the rule that a public act does not go into operation until the 4th of July next after its passage, unless otherwise specially provided in such act. *Rev., p.* 1122, § 13. The eighth section of the act provided that it should take effect immediately as regards the submission to a popular vote. In pursuance of that special provision the act was submitted to a popular vote April 10th, 1888. The other provisions of the act did not become operative until July 4th, 1888. Demand of possession of their records was made on the 1st of June, which was before the relator was entitled to have them. The rule to show cause was granted and argued before the time as of which the respondents' office ceased, and before they could be required to yield possession of the books.

A new rule may be taken and the case set for argument immediately upon another demand of the books, and be heard on the state of case agreed on, and be decided upon the argument already had, if that course be desired. Whatever disposition of the case be made under this rule to show cause will be without costs. If a new rule is required, costs may be awarded.