FIDELITY UNION TRUST COMPANY, A BANKING CORPORA-
TION OF THE STATE OF NEW JERSEY, AS TRUSTEE UNDER
THE GENERAL BOND RESOLUTION OF THE NEW JERSEY
HIGHWAY AUTHORITY ADOPTED JULY 8, 1953, AS SUPPLE-
MENTED; FIRST NATIONAL STATE BANK OF NEW JERSEY,
A NATIONAL BANKING ASSOCIATION, AS TRUSTEE UNDER
THE JUNIOR BOND RESOLUTION OF THE NEW JERSEY
HIGHWAY AUTHORITY ADOPTED JULY 7, 1962, AS SUPPLE-
MENTED, PLAINTIFFS-RESPONDENTS, AND MIDLANTIC
NATIONAL BANK, A NATIONAL BANKING ASSOCIATION,
AS TRUSTEE UNDER THE IMPROVEMENT BOND RESOLU-
TION OF THE NEW JERSEY HIGHWAY AUTHORITY ADOPT-
ED JULY 27, 1971, AS SUPPLEMENTED, PLAINTIFF, v. NEW
JERSEY HIGHWAY AUTHORITY, A BODY CORPORATE AND
POLITIC CREATED AND EXISTING UNDER AND BY VIRTUE
OF CHAPTER 16 OF THE LAWS OF 1952, AS AMENDED AND
SUPPLEMENTED, AND JOHN J. DEGNAN, ATTORNEY GEN-
ERAL OF THE STATE OF NEW JERSEY, DEFENDANTS-AP-
PELLANTS.

Argued April 21, 1980—Reargued November 3, 1980.

Decided March 2, 1981.

278

280

*Stephen Skillman,* Assistant Attorney General, argued the cause for appellant John J. Degnan (*John J. Degnan,* Attorney General of New Jersey, attorney; *Leonard A. Peduto, Jr.,* Deputy Attorney General, on the briefs).

*Arthur D. Grossman* argued the cause for appellant New Jersey Highway Authority (*Fox and Fox,* attorneys).

*Kevin J. Coakley* argued the cause for respondents (*Connell, Foley & Geiser,* attorneys for First National State Bank; *Riker, Danzig, Scherer & Debevoise,* attorneys for Fidelity Union Trust Company; *Kevin J. Coakley* and *Robert Fisher,* of counsel; *Robert J. Kelly,* on the brief).

The opinion of the Court was delivered by

SCHREIBER, J.

We are called upon to consider in this case the impact on holders of New Jersey Highway Authority bonds of an amendment to the New Jersey Highway Authority Act, *N.J.S.A.* 27:12B–1 *et seq.* (Act), which confers upon the Governor and either the state treasurer or the comptroller of the treasury the

right in effect to veto toll adjustments, their written approvals being required before tolls may be modified, *L.* 1973, *c.* 370, § 1 (amending *N.J.S.A.* 27:12B–4). The asserted invalidity of the amendment is primarily ascribed to the clauses in the federal and state constitutions, Art. I, § 10, and Art. IV, § VII, par. 3, respectively, prohibiting impairment of the obligation of contracts.[1]

. Fidelity Union Trust Company and First National State Bank as trustees under certain bond resolutions of the New Jersey Highway Authority (Authority) brought a declaratory judgment action against the Authority and the Attorney General seeking to invalidate the amendment.[2]  Upon cross motions for summary judgment the trial court considered among other things various bond resolutions of the Authority and two affidavits concerning the financial effect of the amendment. It held that the requirement that tolls could not be raised or adjusted without the prior approval impaired the bondholders' contract rights in violation of the Contract Clauses of both the federal and state constitutions. 164 *N.J.Super.* 246 (Ch.Div.1978). The defendants, the Authority and the Attorney General, appealed. Pursuant to *R.* 2:12–1, we granted the Attorney General's motion for direct certification which was joined in by all parties. 82 *N.J.* 282 (1979). We reverse.

The Act created a body corporate known as the New Jersey Highway Authority. *N.J.S.A.* 27:12B–4. Its declared purposes were to construct, operate, maintain and improve "modern express highways embodying every known safety device including

---

[1]Plaintiffs initially contended that the amendment violated the Fourteenth Amendment and Art. I, § I of the state constitution. However, these contentions were not briefed or argued on appeal and apparently have been abandoned.

[2]Midlantic National Bank also joined in the suit as Trustee of Parkway Improvement Revenue Bonds, 1971 Series. However, these bonds were satisfied in full while the appeal was pending and the claim was dismissed by stipulation.

center divisions, ample shoulder widths, long-sight distances, multiple lanes in each direction and grade separations at all intersections with other highways and railroads ...." *N.J.S.A.* 27:12B–2. The Authority was given specific powers to accomplish these purposes. Included were the power to fix, revise and collect tolls, *N.J.S.A.* 27:12B–5(i), and the authorization to issue bonds and notes to be secured by a pledge of all or any part of its tolls or revenues, *N.J.S.A.* 27:12B–9(a)(i). Furthermore, it was authorized to include a covenant with respect to the toll rates "to be established and charged" in a contract with the proposed security holders. *N.J.S.A.* 27:12B–9(a)(viii). The State pledged to all future holders of the bonds that it would not limit or restrict the rights vested in the Authority "to establish and collect such tolls or other charges as may be convenient or necessary to produce sufficient revenues to meet the expenses of maintenance and operation ... and to fulfill the terms of any agreements made with the holders of bonds or notes ... or in any way impair the rights or remedies of the holders ...." *N.J.S.A.* 27:12B–11. Moreover, the tolls were not to "be subject to supervision or regulation by any other commission, board, bureau or agency of the State." *N.J.S.A.* 27:12B–14. Some of the bonds to be issued, up to $285,000,000 in aggregate principal amount, were entitled to a state guarantee of payment of interest and principal. *L.* 1952, *c.* 17, § 1 (current version at *N.J.S.A.* 27:12B–20).

When first created, the Authority consisted of three members appointed by the Governor with the advice and consent of the Senate. Two members constituted a quorum and the vote of two was necessary for motions or resolutions. *L.* 1952, *c.* 16, § 4 (current version at *N.J.S.A.* 27:12B–4). Subsequently, the membership was increased to five, three being necessary for a quorum and action. *L.* 1970, *c.* 28, § 1 (current version at *N.J.S.A.* 27:12B–4). The Act was amended again to provide for seven members, four being necessary for a quorum and action. *N.J.S.A.* 27:12B–4 (as amended by *L.* 1975, *c.* 5, § 1).

The specific highway project which the Authority was directed to undertake was construction of "The Garden State Parkway" from Route 17 in Paramus to Cape May. *N.J.S.A.* 27:12B–20. The Authority issued and sold bonds of various series to finance the cost of that construction. The road was thereupon built and subsequently extended and enlarged. It has been a successful project. According to the Authority's 1977 Annual Report there were 196,390,000 toll trips in that year. Indeed bond interest and bond service (interest and principal amount due on maturing bonds) were covered 3.496 and 1.317 times, respectively. The standard toll on the Parkway since its inception more than 25 years ago has been 25 cents.

Plaintiffs, as trustees of several Authority bond issues, sought to invalidate the amendment to the Act effective January 4, 1974, a date subsequent to the issuance of the bonds. See *L.* 1973, *c.* 370, § 1 (amending *N.J.S.A.* 27:12B–4). That amendment reads in pertinent part as follows:

No resolution or other action of the authority providing for the issuance of bonds, refunding bonds or other obligations or for the fixing, revising or adjusting of tolls for the use of any highway projects or parts or sections thereof shall be adopted or otherwise made effective by the authority without the prior approval in writing of the Governor and at least one of the following: the State Treasurer and the Comptroller of the Treasury. The powers conferred in this section upon the Governor, the State Treasurer and the Comptroller of the Treasury shall be exercised with due regard for the rights of the holders of bonds of the authority at any time outstanding, and nothing in, or done pursuant to, this section shall in any way limit, restrict or alter the obligation or powers of the authority or any representative or officer of the authority to carry out and perform in every detail each and every covenant, agreement or contract at any time made or entered into by or on behalf of the authority with respect to its bonds or for the benefit, protection or security of the holders thereof.

A true copy of the minutes of every meeting of the authority shall be forthwith delivered by and under the certification of the secretary thereof, to the Governor. No action taken at such meeting by the authority shall have force or effect until 10 days (Saturdays, Sundays and holidays excepted) after such copy of the minutes shall have been delivered or the approval thereof by the Governor prior thereto. If, in said 10–day period, the Governor returns such copy of the minutes with veto of any action, except action to negotiate or

execute a collective negotiation agreement with a certified public employee organization representing employees of the authority, taken by the authority or any member thereof at such meeting, such action shall be null and of no effect.

It is this change, the requirement that revision of the tolls by the Authority may not be effective without the prior written approval of the Governor and the state treasurer or comptroller of the treasury, that the trustees contend violates the Contract Clauses of the federal and state constitutions.

The terms and conditions of each bond series of which the Fidelity Union Trust Company is trustee are prescribed in a General Bond Resolution adopted by the Authority on July 8, 1953 and in supplemental resolutions authorizing the particular series.[3] First National State Bank is the trustee of Junior

---

3 GENERAL BOND RESOLUTION (1953)

| | Series | Issue Date | Authorized | Outstanding 12/31/78 |
|---|---|---|---|---|
| A. | (First Supplemental Bond Resolution) | 7/1/53 | $150,000,000 | $60,216,000 |
| B. | (Second Supplemental Bond Resolution) | 1/1/54 | $135,000,000 | $54,980,000 |
| C. | (Third Supplemental Bond Resolution) | 11/1/54 | $ 20,000,000 | $ 7,947,000 |
| D. | (Fourth Supplemental Bond Resolution) | 7/1/56 | $ 8,000,000 | --- |
| E. | (Fifth Supplemental Bond Resolution) | 7/1/56 | $ 17,000,000 | --- |
| F. | (Sixth Supplemental Bond Resolution) | 1/1/64 | $ 24,900,000 | $10,471,000 |

Series A and B are unconditionally guaranteed by the State of New Jersey as to punctual payment of principal and interest. See L. 1952, c. 17 (current version at N.J.S.A. 27: 12B–20); First Supplemental Resolution Art. III, § 301 (1953); Second Supplemental Resolution Art. III, § 301 (1953).

Revenue Bonds, issued pursuant to a Junior Bond Resolution and a First Supplemental Junior Bond Resolution adopted on July 7, 1962.[4]

Article I, § 10 of the United States Constitution prohibits a state from passing any "Law impairing the Obligation of Contracts . . . ." The Contract Clause was originally intended to protect agreements entered into between private parties from state legislative interference. *G. Gunther, Constitutional Law* 604 (9 ed. 1975). As early as 1810, however, judicial interpretation extended the sweep of the clause to include agreements to which the state was a party. *Fletcher v. Peck,* 10 *U.S.* (6 Cranch) 87, 3 *L.Ed.* 162 (1810). In the nineteenth century the United States Supreme Court use the Contract Clause more than any other constitutional provision to invalidate state legislation. *B. Schwartz, A Commentary on the Constitution of the United States, Part II: The Rights of Property* 268 (1965). The clause was not without its limitation for there also developed a doctrine of inalienability known as the "reserved powers" doctrine—the concept that a state could not bargain away certain powers, such as the power of eminent domain, *Contributors to the Pennsylvania Hospital v. City of Philadelphia,* 245 *U.S.* 20, 38 *S.Ct.* 35, 62 *L.Ed.* 124 (1917), and the police power so that contracts could "not estop the legislature from enacting laws intended for the public good." *Manigault v. Springs,* 199 *U.S.* 473, 480, 26 *S.Ct.* 127, 130, 50 *L.Ed.* 274, 278 (1905); *Stone v. Mississippi,* 101 *U.S.* 814, 25 *L.Ed.* 1079 (1880). After 1890 the Court emphasized the Fourteenth Amendment restriction proscribing states from depriving a person of property without due process and from taking property without just compensation and the Contract Clause fell into general disuse. *Schwartz, supra* at

---

[4]These bonds were designated Series One. The principal amount authorized and issued was $40,000,000, the full amount being outstanding as of December 31, 1978.

306. However, two recent Supreme Court decisions, *United States Trust Co. v. New Jersey*, 431 *U.S.* 1, 97 *S.Ct.* 1505, 52 *L.Ed.2d* 92 (1977), and *Allied Structural Steel Co. v. Spannaus*, 438 *U.S.* 234, 98 *S.Ct.* 2716, 57 *L.Ed.2d* 727 (1978), have revived the use of the clause in determining validity of a state's economic legislation.

In *United States Trust*, the Port Authority of New York and New Jersey had issued bonds which contained a statutory covenant restricting the extent to which revenues could be applied to deficits created by mass transit operations. New York and New Jersey later repealed the covenant. Justice Blackmun, writing on behalf of a majority of four, held that the repeal violated the Contract Clause. After finding the statutory covenant had been integrated in the contract between the Authority and the bondholders, he concluded that "[a]s a security provision, the covenant was not superfluous; it limited the Port Authority's deficits and thus protected the general reserve fund from depletion." 431 *U.S.* at 19, 97 *S.Ct.* at 1516, 52 *L.Ed.2d* at 108. This same factual conclusion had been reached by the trial court which had stated:

> To the extent that the repeal of the covenant authorizes the Authority to assume greater deficits for such purposes, it permits a diminution of the pledged revenues and reserves and may be said to constitute an impairment of the states' contract with the bondholders. [134 *N.J.Super.* at 183]

■ Having found that the repeal of the covenant impaired a contractual financial obligation, Justice Blackmun questioned whether that impairment violated the Contract Clause. He noted that states have broad police powers which may affect private contracts so long as their statutes exercising those police powers serve a legitimate public purpose and the adjustment of the private parties' duties and obligations is on reasonable terms and conditions. When a state's contract is involved, the initial inquiry is whether the state had the power to create an irrevocable contract right in the first place, since a state cannot surrender "an essential attribute of its sovereignty." But, in this

respect, a state's authority to enter into financial obligations could not be questioned. *Id.* at 22–24, 97 *S.Ct.* at 1517–1519, 52 *L.Ed.*2d at 109–111.

■ The next step in the analysis is whether the impairment is reasonable and necessary to serve an important public purpose. Necessity is met if the objectives could not have been achieved by a less drastic alternative. Reasonableness depends upon the extent of the impairment and upon whether the circumstances giving rise to the impairment were foreseeable when the contract was made. *Id.* at 29–31, 97 *S.Ct.* at 1521–1522, 52 *L.Ed.*2d at 114–115.

Chief Justice Burger, concurring, emphasized that "the State must demonstrate that the impairment was essential to the achievement of an important state purpose." *Id.* at 32, 97 *S.Ct.* at 1523, 67 *L.Ed.*2d at 116. Moreover, he argued the state would have to show it was unaware of the state interest at the time the covenant was made. *Ibid.*

Any doubts concerning the strength of the majority opinion which may have existed because of the number of justices participating and the division in the Court were dispelled in *Allied Structural Steel Co. v. Spannaus*, 438 *U.S.* 234, 98 *S.Ct.* 2716, 57 *L.Ed.*2d 727 (1978).[5] *Allied Steel* involved a pension agreement between a company and its employees. Minnesota enacted a statute which subjected each employer, having a pension plan and at least 100 employees, to a pension obligation if it closed its Minnesota operations, to those employees who had been employed at least 10 years. Allied shut down its Minnesota facilities leaving at least nine employees who had ten years service with no vested pension rights. The state of Minnesota notified the company that a pension funding charge of approxi-

---

[5]Justices Stewart and Powell, who had not participated in *United States Trust*, joined in the majority, with Justice Blackmun abstaining.

mately $185,000 was required to satisfy the entitlement of those employees.

Justice Stewart, writing for the majority, began his analysis by inquiring whether "the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Id.* at 244, 98 *S.Ct.* at 2722, 57 *L.Ed.*2d at 736. He explained:

> The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation. [*Id.* at 245, 98 *S.Ct.* at 2722-2723, 57 *L.Ed.*2d at 736-737]

Finding that the modification of the pension plan was substantial because of the added financial burden, he held that the statute did not embrace a broad societal interest, did not operate in an area which had been subject to state regulation when the pension plan became effective, and did not simply cause a temporary alteration of contractual relationships. He declared the law unconstitutional. *Id.* at 245-251, 97 *S.Ct.* at 2723-2725, 57 *L.Ed.*2d at 737-740.

■ In summary, then, the *United States Trust* and *Allied Steel* cases suggest the following analyses for our purposes:[6] (1) What were the terms of the agreement between the parties? (2) Was there an impairment of a financial condition of the contract? (3) If so, was it substantial? (4) Since the contract was with the State, did the State have the ability to limit its power to act in the future with respect to the administration of the New Jersey Highway Authority Act?

---

[6] Commentators have suggested varied interpretations of these cases. See, *e. g.* Hurst, "Municipal Bonds and the Contract Clause: Looking Beyond *United States Trust Company v. New Jersey*," 5 *Hastings Const. L.Q.* 25 (1978); Note, "State Adjustment of Private Employer's Obligations under Pension Plan Violates Contract Clause—*Allied Structural Steel Co. v. Spannaus*, 9 *Seton Hall L.Rev.* 784 (1978); Note, "Revival of the Contract Clause: *Allied Structural Steel Co. v. Spannaus* and *United States Trust Co. v. New Jersey*," 65 *Va. L.Rev.* 377 (1979); Note, "A Process-Oriented Approach to the Contract Clause," 89 *Yale L.J.* 1623 (1980).

## I.

Analysis of the instant case must begin with identification of the terms of the agreement between the Authority and the bondholders. Provisions in the bond resolutions and the Act are the constituent elements of the contract with the bondholders. *N.J.S.A.* 27:12B–9(a).[7] Though administration of the Act was entrusted to the Authority's members when the bonds were issued, bond purchasers knew that the Authority as it existed might not remain the same throughout the life of the bonds. The Authority's composition, size or even existence were not frozen. "Authority" had been defined in the statute to include

the board, body or commission succeeding to the principal functions thereof or to whom the powers given by this act to the Authority shall be given by law. [*N.J. S.A.* 27:12B–3(a)]

The statutory definition was substantially incorporated in the General Bond Resolution defining "Authority" to include the board, body or commission succeeding to its functions "or [those] to whom the powers given by the Act to the Authority shall be given by law." *General Bond Resolution (GBR)* Art. I, § 102(7). The Junior Bond Resolution incorporated this definition by reference to the General Bond Resolution. *Junior Bond Resolution (JBR)* Art. I, § 102. Furthermore, whenever the Authority was named or referred to in the General Bond Resolution it was "deemed to include its successors and assigns whether so expressed or not." *GBR* Art. I, § 104; *JBR* Art. I, § 105. None of the supplemental bond resolutions modified these provisions.

The bondholders could harbor no reasonable expectation that the existence of the Authority or its composition was immutable. Plaintiffs conceded during oral argument that the legislative changes made in the number of Authority members were within the contractual terms. As previously observed, their number went from three to five to seven, and with each increase the number needed to adopt any proposal, including toll adjust-

---

[7] *N.J.S.A.* 27:12B–9(a) states that the resolution authorizing the issuance of bonds "shall constitute a contract with the holders thereof."

ments, increased as well. Of course, it was understood that the members, whose terms were five years,[8] would change throughout the life of the bonds. Furthermore, the Legislature could properly as an administrative matter have eliminated the Authority and transferred its functions to another agency or department of government.

In the absence of some other state constitutional limitation, none of which is involved herein,[9] the Legislature could lawfully have abolished the Authority and transferred all its powers and obligations to a board consisting of the Governor and state treasurer. Such a change would be within the contemplation of the express provisions of the Act and the bond resolutions. No modification in the terms and conditions of the bonds is involved and the obligation to establish and collect such tolls as may be necessary to produce sufficient revenues to fulfill the terms of agreements with the bondholders remains unimpaired. *N.J.S.A.* 27:12B–11. In the final analysis all that has occurred here is an alteration in the structure of the governance of the Garden State Parkway. The further inclusion of the Governor in the administrative process is but an extension of his relationship to the Authority membership, for not only does the Governor nominate its members, but he also designates the chairman and vice-chairman who serve in those positions at his pleasure. *N.J.S.A.* 27:12B–4.[10] The purchasers of the bonds could not

---

[8]Originally terms were nine years. *L.* 1952, c. 16, § 4 (current version at *N.J.S.A.* 27:12B–4).

[9]The creation of authorities which are authorized to borrow funds to carry out specified projects avoids the constitutional restriction on the amount of state debt. *N.J.Const.* (1947), Art. VIII, § II, par. 3; *New Jersey Turnpike Authority v. Parsons*, 3 *N.J.* 235 (1949). It is not here contended, nor has it been demonstrated, that the structural change involved herein offends the constitutional debt limitations clause or the fiscal independence of the Authority.

[10]It is noteworthy that under the Act the Authority could only receive and accept from any federal agency grants for acquisition or construction of projects subject to the Governor's approval. *N.J.S.A.* 27:12B–5(r).

have been under any mistaken belief that the Authority's powers and duties could not have been transferred to others within the governmental framework.

Plaintiffs contend that the statutory provision that the tolls "shall not be subject to supervision or regulation by any other commission, board, bureau or agency of the State," *N.J. S.A.* 27:12B–14, is violated by authorizing the Governor and another state official to veto a modification in the tolls. Literally read, this might be so. However, that provision must be interpreted *in pari materia* with provisions authorizing a transfer of the Authority's functions to others and granting the Governor authority to nominate the Authority's members and to designate the chairman and vice-chairman. Therefore the language should not be given that broad interpretation derived from a literal reading. Rather, we construe *N.J.S.A.* 27:12B–14 to relate to affirmatively supervising and regulating the collection and application of the tolls. This section does not refer to either the political structure of the governing entity or the watchdog capacity given to the Governor to safeguard the interest of the public and bondholders. In this latter respect it must be remembered that the amendment grants only a veto power.

Furthermore, this construction accords with the policy discussed in Part IV *infra,* that the right of future legislatures to modify governmental structures cannot be substantially restricted or bargained away. Interpreting the provision as plaintiffs contend might run afoul of this principle. Moreover, even if plaintiffs' interpretation were accepted, a violation would not constitute a substantial impairment of the terms and conditions of the bonds. See Part III *infra.* We conclude that the statutory amendment did not violate the terms of the agreement between the Authority and the bondholders.

## II.

Unlike the legislation invalidated in *United States Trust* and *Allied Steel*, the amendment here did not involve a substantial financial condition of the agreement. Here the financial security of the bondholders is guaranteed by requiring that the tolls be fixed and adjusted to satisfy the terms and provisions of the contract with the bondholders. *N.J.S.A.* 27:12B–14. The bond resolutions [11] required that the Authority set tolls and charges so that the total net revenue in each calendar year equaled at least 120% of the aggregate bond service for the calendar year. *GBR* Art. I, § 711; *JBR* Art. I, § 711. In the event revenues were insufficient to pay interest on all the bonds and the principal amount of those due, the bonds would not be in default. Instead the Authority had to file with the trustee before May 1 of the next calendar year an engineer's certificate setting forth a schedule of tolls or other charges designed to increase the revenues so that the 120% requirement would be satisfied. *GBR* Art. I, § 1001; *JBR* Art. I, § 1001. The engineer had to be independent and satisfactory to the trustee. *GBR* Art. I, § 102(20); *JBR* Art. I, § 103(16).

The General Bond Resolution provided that all revenues from tolls and fees were to be deposited in a Revenue Fund from which the Authority would pay its operating expenses and maintain its working capital. Excess funds would then be placed to the extent needed in the Bond Service Fund, Bond Reserve Fund, Construction Fund, General Fund and Bond Redemption Fund in that order. The Bond Service Fund contained those sums needed to pay the interest on and principal of the bonds maturing in a period of time fixed by the terms of the particular bond series. The principal amount of those bonds which were maturing was to be transferred to the Bond Redemption Fund shortly before the due dates. The Bond Reserve Fund was set up to hold monies which might be needed if there

---

[11]All the terms and conditions referred to hereinafter with respect to the General and Junior Bond Resolutions are the same as those applicable to the supplemental resolutions.

were a deficiency in the Bond Service Fund. The General Fund was used as a backup for the other funds. *GBR* Art. V, §§ 502–508. The Junior Bond Resolution established a similar scheme. *JBR* Art. V, §§ 501–509.

None of these requirements for the financial security of the bondholders was diminished by the 1973 amendment. Though procedurally the Governor and the state treasurer or comptroller of the treasury were called upon to approve toll adjustments, these officers could exercise that power only

> with due regard for the rights of the holders of bonds of the authority at any time outstanding, and nothing in, or done pursuant to, this section shall in any way limit, restrict or alter the obligation or powers of the authority or any representative or officer of the authority to carry out and perform in every detail each and every covenant, agreement or contract at any time made or entered into by or on behalf of the authority with respect to its bonds or for the benefit, protection or security of the holders thereof. [*N.J.S.A.* 27:12B–4]

■ Thus it is incumbent on the Governor and the state treasurer or comptroller to comply with the identical toll adjustment provisions of the bond resolution. They have precisely the same obligations as the Authority members to protect the bondholders' rights. At most there has been a change in the identity of the individuals charged with assuring that the interest of the bondholders and the public in toll adjustments is safeguarded. There has been no substantive alteration in the terms of the bonds. Thus if the revenues do not meet the 120% test, the tolls *must* be adjusted substantially to those prescribed by the engineer's certificate irrespective of the identity of those in charge.

■ There is considerable authority for the proposition that the Legislature may substitute the officers who administer a project without contravening the Contract Clause. In *State ex rel. Warner v. Hoagland*, 51 *N.J.L.* 62 (Sup.Ct.1888), the Legislature abolished a street and sewer commission for the City of New Brunswick, replacing it with the local governing body. The commission had issued improvement bonds, secured by assessments, to finance construction. In finding no impairment of the rights of holders of street and sewer commission bonds in

the transfer of its responsibilities to the governing body, Justice Depue held:

Creditors holding bonds issued by the commissioners have no security for payment beyond the credit of the city and the pledge of assessments. These bonds are obligations of the city, and are enforceable against the city, notwithstanding the repeal of the law under which they were issued; and assessments pledged for their payment may be made available at the instance of creditors, notwithstanding a change in the official body having the collection of them. A change in the mode in which creditors' rights are to be enforced, which does not affect any substantial right, is no infringement of the constitutional rights of creditors. *Munday v. Rahway,* [43 *N.J.L.* 338 (Sup.Ct.1881), 44 *N.J.L.* 395 (E. & A. 1882)]; *United Companies v. Weldon,* [47 *N.J.L.* 59 (Sup.Ct.1885)]. Nor are the respondents constituted the guardians of the rights of the city's creditors. They cannot, as representatives of the city's creditors, protect their official existence from the power of the state to abolish their office. [51 *N.J.L.* at 73–74]

In *Rorick v. Board of Commissioners,* 57 *F.*2d 1048 (N.D.Fla. 1932), vacated on jurisdictional grounds, 307 *U.S.* 208, 59 *S.Ct.* 808, 83 *L.Ed.* 1242 (1939), the state of Florida had established the Everglades Drainage District for the purpose of reclaiming swamp lands. The governor and four other state officials were initially charged with management of the administrative and fiscal affairs of the district. During their tenure, bonds were sold to finance the construction of a system of canals, dykes, drains and levees. Payment of interest and repayment of principal were obtained from special taxes assessed on all district land. Thereafter, the Florida legislature changed the membership of the governing board from the state officers to five civilian landowners. Holders of the district's bonds filed suit, contending that the amendment had impaired the obligation of their debt contracts with the district by replacing the original state officers on the board of commissioners. The court rejected the plaintiffs' argument, observing:

The provisions of the 1931 act, changing the personnel of the board of commissioners to five civilians in lieu of five state officers as originally provided, impairs no vested contract right of plaintiffs. The district remains, with officers empowered to perform all its duties toward bondholders. Neither the resources nor the remedy for the payment of plaintiffs' bonds are affected within the purview of the contract clause of the Constitution. *A mere change in personnel of a public board or body is not usually regarded as an impairment of contract obligations.* [57 *F.*2d at 1063 (emphasis supplied)]

To the same effect, see *Reppel v. Board of Liquidation*, 11 F.Supp. 799, 804 (E.D.La.1935); *Hall v. Underwood*, 258 *Ala.* 392, 402–405, 63 *So.*2d 683, 692–694 (Sup.Ct.1953); *California Highway Commission v. Ballard*, 77 *Cal.App.* 404, 414, 247 *P.* 527, 531 (3 Dis.Ct.App.1926); *Opinion of the Justices*, 246 *A.*2d 90, 95–96 (Del.Sup.Ct.1968); *Jackson v. Consolidated Government*, 225 *So.*2d 497, 504–505 (Fla.Sup.Ct.1969); *People ex rel. Housing Authority v. Hursey*, 7 *Ill.*2d 537, 543, 131 *N.E.*2d 483, 486 (Sup.Ct.1956); *State ex rel. Porterie v. Walmsley*, 183 *La.* 139, 178–186, 162 *So.* 826, 838–840 (Sup.Ct.1935), appeal dismissed, 296 *U.S.* 540, 56 *S.Ct.* 141, 80 *L.Ed.* 384 (1935); *Board of Education v. Dixson*, 202 *Okla.* 110, 111, 210 *P.*2d 669, 670 (Sup.Ct.1949).

■ Which department, agency or officer is charged with the administration and execution of the New Jersey Highway Authority Act is an organizational decision that does not touch upon the financial obligation owed the bondholders. Here the plaintiffs' assertion that only the Authority may carry out the functions delegated to it fails to recognize that the Authority is the instrumentality to which the project was entrusted. *Behnke v. New Jersey Highway Authority,* 13 *N.J.* 14, 29 (1953). That delegation is not directly related to the financial integrity of the bonds. Who will execute the terms of the agreement is an administrative matter. It is a governmental function reserved to the State and not a financial condition of the agreement.[12]

### III.

■ We are also satisfied that even if the statutory amendment be deemed a modification of the bondholders' agreement,

---

[12]Plaintiffs contend that the amendment contravenes the State's pledge and agreement pursuant to *N.J.S.A.* 27:12B–11 not to limit or restrict the rights vested in the Authority to maintain any project or to establish and collect tolls or charges convenient or necessary to meet maintenance and operating expenses and fulfill the terms of agreements with the bondholders. This contention misses the point, for the obligation to fix the rate schedule and satisfy all the terms of the agreement remains unimpaired. *Cf. New Jersey Highway Authority v. Sills*, 109 *N.J.Super.* 424 (Ch.Div.1970), supp. 111

it is at most insubstantial. Both *United States Trust* and *Allied Steel* agreed that not every impairment violates the Contract Clause. The impairment must be substantial. Plaintiffs have not demonstrated any adverse financial impact upon their bonds. The only affidavits submitted with the motions stated that the amendment had no effect on the market value of the bonds. The financial security for the bondholders is the establishment of a rate and application of the revenues consistent with the requisite standards. These criteria remain unimpaired.

The trustees contend that delay in the adjustment of the tolls will create a regulatory lag that will impair the bondholders' security. We perceive no merit in that contention. The written approval of the Governor and the state treasurer must be given within a reasonable period of time. If the effectiveness of the Authority's action depends upon submission of the minutes to the Governor, he would have to act within ten days. In the event of a failure to act within the ten day period, the proposed action would become effective. The slight delay in the approval of a new rate schedule cannot realistically be considered a substantial impairment, particularly when the Governor is bound by the timetable in the bond resolutions, including the filing of the engineer's certificate with a toll schedule before May 1, so that the bondholders will be unaffected.

Plaintiffs and the trial court relied heavily on *Patterson v. Carey*, 41 *N.Y.2d* 714, 363 *N.E.2d* 1146, 395 *N.Y.S.2d* 411 (Ct. App.1977). There the New York legislature rescinded an increase in a parkway toll set by the Parkway Authority and amended the statutory procedure for future increases by imposing a new four stage review process. The Court of Appeals declared the amendatory act invalid on three grounds, the due process clause of the state constitution, improper interference with the state comptroller's discretionary power to supervise

*N.J.Super.* 313 (Ch.Div.1970), aff'd *p.c.o.b.* 58 *N.J.* 432 (1971), where statute permitting National Guard personnel and reserves in the armed forces to use the Parkway without fee was held unconstitutional, being in direct conflict with the statutory provision proscribing any vehicle from using the Parkway without paying the prescribed tolls, *N.J.S.A.* 27:12B–18(a). The Attorney General conceded its invalidity under the Contract Clause.

financial accounts of public authorities, and the Contract Clause of the federal constitution. In its rationale concerning the Contract Clause, the court asserted that the "[b]ondholders were guaranteed that the authority would have the necessary power to raise tolls in order to pay authority obligations." 41 *N.Y.2d* at 721, 363 *N.E.2d* at 1152, 395 *N.Y.S.2d* at 417. It found an "infringement upon the right to set a proper toll invaded the contractual rights of . . . Authority bondholders." *Id.* at 722, 363 *N.E.2d* at 1153, 395 *N.Y.S.2d* at 417. Unlike the New Jersey statute the intermediaries in the review process were not bound by the same criteria as the Authority. Thus the integrity of the financial conditions, unimpaired under the New Jersey statute, was not assured under the New York law. Moreover, we do not find its reasoning persuasive for we perceive the contractual rights of the bondholders to a proper toll remain unimpaired under the administrative amendment of the New Jersey statute.

## IV.

Even if the bondholders' contract did not expressly contemplate a modification or abolition of the Authority, the change would be valid for we have serious doubts whether the State may lawfully bargain away its right to modify the structure of government. The Contract Clause was not intended to disable the Legislature from altering the political structure of government. In *United States Trust,* Justice Blackmun recognized that "the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty." 431 *U.S.* at 23, 97 *S.Ct.* at 1518, 52 *L.Ed.2d* at 110. One such power involves governmental organization. It has been said that "[w]hen the State employs officers or creates municipal corporations as the mere agencies of government, it must have the power to discontinue the agency whenever it comes to be regarded as no longer important." T. Cooley, *Constitutional Limitations* 276 (3 ed. 1874). Chief Justice Mar-

shall wrote in *Dartmouth College v. Woodward,* 17 *U.S.* (4 Wheat.) 518, 4 *L.Ed.* 629 (1819):

[T]he framers of the constitution did not intend to restrain the states in the regulation of their civil institutions, adopted for internal government, and . . . the instrument they have given us is not to be so construed . . . . [*Id.* at 629, 4 *L.Ed.* at 657]

The Contract Clause has never been construed or applied as an obstacle to the exercise of the state's authority to change the structure governing a public entity. In *Shapleigh v. San Angelo,* 167 *U.S.* 646, 17 *S.Ct.* 957, 42 *L.Ed.* 310 (1897), the Supreme Court stated:

The State's plenary power over its municipal corporations to change their organization, to modify their method of internal government, or to abolish them altogether, is not restricted by contracts entered into by the municipality with its creditors or with private parties. [167 *U.S.* at 654, 17 *S.Ct.* at 959, 42 *L.Ed.* at 313]

Thus a contractual relationship between a private party and a governmental entity is not affected when the political structure of the entity changes for governmental rights, rather than property rights, are directly and substantially implicated. See Schultz, "The Effect of the Contract Clause and the Fourteenth Amendment Upon the Power of the States to Control Municipal Corporations," 36 *Mich.L.Rev.* 385, 407 (1938).

## V.

*N.J.Const.* (1947), Art. IV, § VII, par. 3, provides that the "Legislature shall not pass any . . . law impairing the obligation of contracts, or depriving a party of any remedy for enforcing a contract which existed when the contract was made." The last clause regarding remedies was added at the 1844 Convention in response to United States Supreme Court decisions which had distinguished between impairment of an obligation and impairment of its remedy. *Rader v. Southeasterly Road District,* 36 *N.J.L.* 273, 276–278 (Sup.Ct.1873). However, despite the dissimilarity in language, this Court has recognized that the provisions of the federal and state constitutions provide "parallel guarantees." *P.T. & L. Construction Co. v. Commissioner,* 60 *N.J.* 308, 313 (1972). In the context of this case, where remedies are not

at issue, there is no need to draw a distinction between the two provisions.[13] Accordingly, for all the reasons stated justifying validity under the federal Contract Clause, we find no violation of the state constitution.

Reversed.

*For reversal*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

For affirmance—None.

---

[13]When measuring legislation against the state constitution, we have adhered to the principle that "every possible presumption favors the validity of an act of the Legislature." *New Jersey Sports & Exposition Authority v. McCrane*, 61 *N.J.* 1, 8 (1972). Neither *United States Trust* nor *Allied Steel* referred to this principle.